[Crim. No. 21078. Mar. 24, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
HANS H. H. WEEREN et al., Defendants and Appellants.

656

COUNSEL

Cohen, England, Whitfield & Osborne and Robert A. McSorley for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, N. Gregory Taylor, Assistant Attorneys General, Norman H. Sokolow, Roy C. Preminger, Andrew D. Amerson, John Briscoe and Nancy A. Saggese, Deputy Attorneys General, for Plaintiff and Respondent and as Amici Curiae.

Edwin P. Martin, Clarence S. Hunt, Allan E. Tebbetts, Patrick J. Marley, Peter R. diDonato, Melvin B. Pearlston, Grisham, Vandenberg, Nott, Conway & Cannon and Michael G. Nott as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**RICHARDSON, J.**—Defendants Hans H. H. Weeren and Steven C. Jennings appeal from the judgments of conviction of the misdemeanor violation of Fish and Game Code section 2000, which generally and in relevant part provides: "It is unlawful to take any...fish...except as

provided in this code or regulations made pursuant thereto." The convictions are based on trial court findings that defendants with the use of a spotter aircraft took broadbill swordfish contrary to the regulations of the Fish and Game Department (Cal. Admin. Code, tit. 14, § 107, subd. (g)(2)). This regulation specifically mandates that "Broadbill swordfish may not be taken for commercial purposes except by the holder of a revocable permit issued by the department, and as herein provided....(g) Methods of Take....(2) Aircraft may not be used to directly assist a permittee or any person in the taking of any species of fish while operating under a swordfish permit."

Both of the defendants are citizens and residents of California holding commercial fishing licenses issued by the State of California. Their 19-ton vessel, the *Comanche*, and the accompanying spotter aircraft, were both based in Oxnard, Ventura County, on California's southern coastline. The *Comanche* was licensed for commercial fishing for swordfish under Fish and Game Code sections 7880-7890. It carried an appropriate "certificate of boat registration" and boat registration number required by those statutes. However, because it also was enrolled with a "United States document number," it did not bear the California identification number contemplated by Vehicle Code sections 9840-9860.

On September 28, 1977, California Fish and Game officials boarded the *Comanche* at a point 10 miles south-southeast of Anacapa Island in waters of the Santa Barbara Channel, situated more than 3 nautical miles from the shore of either the mainland or of any California coastal islands. The officials determined that two swordfish seized on the *Comanche* had been caught at that location by defendants, with the help of radio communication and directions from a spotter aircraft. The officials remained aboard while the *Comanche* sailed under their direction to Channel Island Harbor in Ventura County.

We will affirm defendants' convictions on the ground that California, in the protection of its legitimate interests may exercise penal control over its citizens extraterritorially. Furthermore, because of previous uncertainty and the continuing importance of the issues presented, we examine successively the opposing contentions of the parties as they bear on (1) the nature and location of California's territorial waters as well as (2) the extent of California's extraterritorial penal authority.

### 1. *California's Territorial Waters*

Defendants assert that because the precise location of the *Comanche* when she was boarded was beyond California's boundaries their convictions must fall. In resolving this issue we are aided by general principles and an examination of a series of federal and state constitutional and legislative enactments as well as United States Supreme Court interpretations thereof.

■ As a general proposition the sea boundaries of a coastal nation or state are traditionally fixed with reference to its "inland waters" and "marginal sea." The outer sea boundary is deemed to be a line which runs parallel to and seaward from the coast, and the zone of water between the land mass and that line is referred to as the "marginal sea." The landward edge of this marginal sea need not be the precise water's edge at low tide. Where the shoreline is characterized by irregular bays, inlets, and harbors and random nearby islands the waters within these irregular configurations are considered "inland waters" of the nation or state, subject to its sovereignty, dominion and control. (See Gross, *The Maritime Boundaries of the States* (1966) 64 Mich.L.Rev. 639, 640.)

■ In seeking to define California's seaward boundary, our first source of authority is federal. The United States Congress, alone, through its power to admit new states, may set state boundaries "as a domestic matter. Such a boundary [is] fully effective as between Nation and State....," regardless of contrary state claims or expectations. (*United States* v. *Louisiana* (1960) 363 U.S. 1, 35 [4 L.Ed.2d 1025, 1049, 80 S.Ct. 961]; see *United States* v. *California* (1965) 381 U.S. 139, 157 [14 L.Ed.2d 296, 308, 85 S.Ct. 1401] (*California II.*) Accordingly, when the extent of a state's territorial jurisdiction is relevant to the operation of federal law, the congressional delineation of state boundaries prevails over conflicting state assertions.

The people of California have purported to describe their own boundaries both constitutionally and legislatively. Both the 1849 and 1879 Constitutions in article XXI, section 1, described the California sea boundary as extending "three English [i.e., nautical] miles" into the Pacific Ocean, running "in a northwesterly direction and following the direction of the Pacific Coast.....*Also, including all the islands, harbors, and bays along and adjacent to the coast.*" (Italics added; see present art. III, § 2.)

To implement the foregoing constitutional provision the Legislature in 1949 enacted Government Code section 170 which recites: "To give greater precision to the [constitutional description], it is hereby declared that the [sea]...boundary...runs *and has in the past run* three English nautical miles oceanward of lines drawn along the outer sides of the outermost of the islands, reefs, and rocks along and adjacent to the mainland and across intervening waters;...." (Italics added.)

Section 171, in turn, provides that all water between the mainland and the island-encircling lines described in section 170 "are declared to be *and to have been in the past* inland waters of the State." (Italics added.) The current article III, section 2, of the Constitution, which was adopted in 1972 to replace the 1849-1879 description, declares that the state's boundaries "are those stated in the Constitution of 1849 *as modified pursuant to statute.*" (Italics added.)

All parties concede that the Santa Barbara Channel, including the position at which the *Comanche* was boarded, is "inland waters" under the current state constitutional and statutory language. Must these state declarations yield to the preeminence of federal legislative and judicial expression?

In 1947, the United States Supreme Court held that the United States, rather than the coastal states, possessed all ownership rights in offshore lands and resources. (*United States* v. *California* (1947) 332 U.S. 19 [91 L.Ed. 1889, 67 S.Ct. 1658] (*California I*).) In 1953 Congress responded to *California I* by adopting the Submerged Lands Act (the Act). (43 U.S.C.A. § 1301 et seq.) The Act transferred to the affected individual states title to and management of all lands and resources in or under the navigable waters within their respective "boundaries." (*Id.*, § 1311(b)(1).) Furthermore, the "boundaries" of coastal states were therein defined as those which existed at the time of the state's admission into the Union or which were thereafter approved by Congress or established by the Act itself. In conformity with the then traditional federal view of international sea limits, the 1953 law "approved and confirmed" the "boundaries" of each coastal state as terminating three geographical (nautical) miles seaward from the coast. State claims beyond the three-mile limit were foreclosed except for the assertions by certain southern states that their previously ratified "boundaries" extended *nine* miles into the Gulf of Mexico. (*Id.*, §§ 1301(b), 1312.)

The three- or nine-mile zone described in the Act is measured from the nation's "coast line," (*ibid.*) which is defined as the line of ordinary low water mark where the coast "is in direct contact with the open sea," otherwise, as "the line marking the seaward limit of inland waters." (*Id.*, § 1301(c).) Accordingly, a state's inland waters lie entirely within its "boundaries."

In 1965, in *California II, supra*, 381 U.S. 139, the high court again spoke definitively and specifically on the subject before us, rejecting broad-based arguments that the Santa Barbara Channel constituted inland waters of California under the Act. In holding that the statute left the definition of inland waters to the courts, free of any subjective state expectations (*id.*, at pp. 150-152 [14 L.Ed.2d at pp. 304-306]), the *California II* majority adopted, for convenience, the definition then used internationally by the executive branch of the federal government under the Convention on the Territorial Sea and the Contiguous Zone (15 U.S.T. 1606 (1964)), to which the nation is a signatory. The Convention formula, as applied by the national executive branch in foreign relations, restricts inland waters to certain geographical harbors and bays encircled by a single land mass. (*Id.*, at pp. 169-170 [14 L.Ed.2d at p. 315]; see Convention, art. VII.)

The *California II* opinion also specifically disposed of contentions that the 1849 California Constitution established a "historic" boundary outside the coastal islands ratified by Congress in the Act of Admission (9 Stat. 452 (1850)) and again in the 1953 law. (381 U.S. at pp. 172-175 [14 L.Ed.2d at pp. 316-318].) Under the clear holding of *California II*, the state's territorial claims in Santa Barbara Channel are confined to three-mile belts seaward from the mainland and around the perimeter of each of the islands in the channel. (The *Comanche* was not within any of these belts when it was boarded.)

Furthermore, the foregoing result is unaffected by the adoption of the Fishery Conservation and Management Act of 1976 (FCMA) (Pub. L. No. 94-265; 16 U.S.C.A. § 1801 et seq.), in which Congress asserted "exclusive" United States fishing management jurisdiction over a sea zone beyond state "boundaries" and extending 200 miles seaward from our nation's coastline. (*Id.*, §§ 1811, 1812.) The several states retain jurisdiction over fishing within their "boundaries," but may not "directly or indirectly" regulate fishing outside those "boundaries," except in certain circumstances. (*Id.*, § 1856(a).) Under the FCMA, the precise

location of state "boundaries" for purposes of that law is of central importance "as between Nation and State."

■ We are unable to accept the People's argument that the effect of *California II* is limited solely to issues involving land title which are governed by the Act and that the high court's holding, accordingly, is therefore inapplicable to California's *political* and penal jurisdiction over adjacent seas. Fairly read, *California II* established the state's "boundaries" for *all* purposes, political and proprietary, "as between Nation and State." Accordingly, these "boundaries" are those "boundaries" referred to in the FCMA as the limits of state territorial jurisdiction over fishing, and our reasons for so concluding are several.

First, the legislative history of the Act indicates a congressional assumption that it was transferring title to undersea resources within the states' political boundaries. This history is carefully traced by the high tribunal in *United States* v. *Louisiana, supra*, 363 U.S. 1.

Under long standing case law, the states assumed before 1947 that they owned the natural resources within their territorial waters. (E.g., *The Abby Dodge* (1912) 223 U.S. 166, 173-175 [56 L.Ed. 390, 392-393, 32 S.Ct. 310]; *Manchester* v. *Massachusetts* (1891) 139 U.S. 240, 264 [35 L.Ed. 159, 166-167, 11 S.Ct. 559]; *Pollard's Lessee* v. *Hagan et al.* (1845) 44 U.S. (3 How.) 212, 228-229 [11 L.Ed. 565, 573].) *California I* severely undercut these expectations in holding that ownership of marginal sea resources was an attribute of federal, not state, sovereignty, regardless of the states' seaward boundaries for political purposes. (332 U.S. 19, 35-36 [91 L.Ed. 1889, 1897-1898]; see *Louisiana, supra*, 363 U.S. 1, 17 [4 L.Ed.2d 1025, 1038].) The holding was somewhat tempered a year later, however, when the Supreme Court confirmed that the states retained jurisdiction to exercise their police power in the three-mile belt of "territorial waters." (*Toomer* v. *Witsell* (1948) 334 U.S. 385, 393 [92 L.Ed. 1460, 1469-1470, 68 S.Ct. 1157].)

*California I* triggered immediate congressional attempts to restore to the states ownership rights in the marginal sea. Virtually all of the "quitclaim" bills introduced after *California I* framed the grant of title with reference to state "boundaries." "This framework was employed because the sponsors understood this Court to have established, prior to the *California* decision, a rule of state ownership *itself defined in terms of state territorial boundaries.....*" (*Louisiana, supra*, 363 U.S. at pp. 19-20 [4 L.Ed.2d at p. 1040], italics added.)

The need for specific "boundary" terminology was the subject of spirited congressional debate prior to adoption of the Act. Because many states had no expressly defined sea boundaries, either by direct congressional action, or under state Constitutions ratified by Congress at the time of admission, it was therefore urged that submerged proprietary rights should not depend on proof of state boundaries, and that a quitclaim statute should not refer to them. The executive branch, on the other hand, stressed the effect of the *California I* holding that *political* boundaries, even if they included the marginal sea, did not carry land or resource ownership rights. (*Id.*, at pp. 22-24 [91 L.Ed. at pp. 1890-1891].)

These differing views were resolved by a two-step approach. The Act first definitely established the states' minimum seaward "boundaries," without prejudice to subsequent and greater state claims based on *prior congressional* ratification or approval. (43 U.S.C.A. §§ 1301(b), 1312.) It then tied the statutory grant of title to the "boundaries" thus established. (*Id.*, § 1311; *Louisiana, supra*, 363 U.S. at pp. 21-24 [4 L.Ed.2d at pp. 1040-1042].) Implicit in this approach was the principle that each state had a single, fixed seaward boundary for all domestic purposes, political and proprietary. (See Gross, *supra*, 64 Mich.L.Rev. 639, 642, 665, 670; but see Alexander, The Law of the Sea (1967) p. 238.)

The People's narrow reading of *California II* must be rejected for a second reason. The *California II* court, within a context which is broader than the Act, rejected the precise argument of the People before us. As here, the state claimed in *California II* that its original Constitution, ratified by Congress in the Act of Admission, had established an "historic" boundary beyond the coastal islands. The high court, however, found that the state constitutional language was ambiguous, and that California's interpretation was actually contradicted by the statutory boundary descriptions for certain of the state's coastal counties. (381 U.S. at p. 174 [14 L.Ed.2d at pp. 317-318].) Under these circumstances, in the high court's view the Legislature's unilateral effort, after the event as it were, to clarify the early constitutional description by statute could add no force to the People's claim.

Finally, the relationship of the term "boundaries" in the Act and in FCMA becomes clear when the two enactments are read together. The 1953 law granted the states, within their "boundaries," not only title to lands beneath sea waters, but "the right and power to *manage, administer*, lease, develop, and use" the resources "*within* such lands and

waters" where not in conflict with federal regulation. (43 U.S.C.A. §§ 1311(a)(2), 1314(a).) Specifically, for our purposes, the high court has subsequently interpreted the quoted language as giving the states a concurrent right, using their police power, to control the taking of free-swimming fish within their territories. (*Douglas* v. *Seacoast Products, Inc.* (1977) 431 U.S. 265, 283-285 [52 L.Ed.2d 304, 318-320, 97 S.Ct. 1740].)

The FCMA, on the other hand, asserts almost exclusive *federal* control over offshore fisheries insofar as compatible with the states' rights. By providing that it shall not be construed as "extending or diminishing" a state's authority "within its boundaries," the FCMA leaves, unimpaired, the states with such fishery rights which they either acquired under the Act, or otherwise possessed. FCMA makes clear, however, that, for most purposes, such rights do not extend beyond those "boundaries." (16 U.S.C.A. § 1856(a).) We think it clear that the congressional intent was that the term "boundaries," as used in the 1953 Act and in the 1976 FCMA, should bear the same meaning and receive similar interpretation.

Our conclusion that *California II* necessarily defined the state's inland waters for all national purposes conforms with prior federal decisions, which have consistently held or assumed that, for purposes of federal law, California's territorial claims in the coastal channels and straits are limited to three-mile belts off the mainland shore and surrounding the coastal islands. (*Wilmington Transp. Co.* v. *Cal. R.R. Comm.* (1915) 236 U.S. 151, 152 [59 L.Ed. 508, 509, 35 S.Ct. 276] [Santa Catalina Channel is the "high seas" for purposes of federal economic regulation]; *Hooker* v. *Raytheon Company* (S.D.Cal. 1962) 212 F.Supp. 687, 693-694 [Santa Barbara Channel is the "high seas" under federal Death on the High Seas Act, despite the provisions of Gov. Code, §§ 170-171].) Such consistent interpretation of *California II* also reduces confusion in a complex area by establishing a uniform, precise boundary for all domestic federal purposes. (Cf., *California II*, 381 U.S. at p. 165 [14 L.Ed.2d at pp. 312-313]; Gross, *supra*, 64 Mich.L. Rev. 639, 670.)

The People argue that we have previously extended California's inland waters for purposes of criminal jurisdiction beyond those set by *California II*. *People* v. *Stralla* (1939) 14 Cal.2d 617 [96 P.2d 941], is cited for the proposition, contrary to *California II*, that Santa Monica Bay is entirely within California territory for purposes of enforcement

of the state's gambling laws. (Pp. 632-633; compare *California II*, 381 U.S. at pp. 173-175 [14 L.Ed.2d at pp. 317-318].) In *Stralla*, however, no conflict between state and federal or international law was presented. Indeed, the United States there appeared as amicus curiae in support of California's efforts to end offshore gambling. (14 Cal.2d at p. 619.)

Here, consistent with the high court's conclusion in *California II*, we determine only that Santa Barbara Channel is outside California's boundaries *for purposes of federal law*, and that California's boundaries are those which are established under the Act as interpreted in *California II*. The channel is thereby excluded from California's boundaries. It follows that when defendants committed the acts for which they were convicted, they were not within California's inland waters. To the limited extent with which it conflicts with these conclusions we disapprove *People* v. *Foretich* (1970) 14 Cal.App.3d Supp. 6 [92 Cal.Rptr. 481].

### 2. *Extraterritorial Regulation Under Federal Law*

■ We agree with the People's assertion that federal law does not prohibit California's assertion of penal jurisdiction over defendants even though at the time of their commission of the charged offenses they acted outside of California's territorial limits as defined for federal purposes.

The United States Supreme Court has held that in matters affecting its legitimate interests a state may regulate the conduct of its citizens upon the high seas where no conflict with federal law is presented. (*Skiriotes* v. *Florida* (1941) 313 U.S. 69, 77 [85 L.Ed. 1193, 1200, 61 S.Ct. 924].) More specifically, the court recognized that a state's interests in preserving nearby fisheries is sufficiently strong to permit such extraterritorial enforcement of its laws enacted for that purpose. (*Skiriotes, supra*, at p. 75 [85 L.Ed. at p. 1199]; *Felton* v. *Hodges* (5th Cir. 1967) 374 F.2d 337, 339; *State* v. *Bundrant* (Alaska 1976) 546 P.2d 530, 550-554; see *United States* v. *Alaska* (1975) 422 U.S. 184, 198-199 [45 L.Ed.2d 109, 121-122, 95 S.Ct. 2240].)

It seems obvious that by adoption and enforcement of its control regulations California seeks to prevent the depletion of a very valuable natural resource. Fish swim. By their very nature they move freely across those arbitrary boundaries which are enacted by governmental

entities for official purposes. The commercial and recreational value of California's fisheries are self-evident and are developed, both quantitatively and in their financial aspects, in the record before us. We have no difficulty in discerning in the preservation of its valuable fish population the requisite state interest for extraterritorial enforcement. Furthermore, the state laws here at issue present no conflict with federal swordfish policies because no federal rules in that field have as yet been promulgated under the FCMA.

The record in this case is favorable to the penal reach of California law. Consistent with the *Skiriotes* rationale we observe that defendants are California citizens and residents. Both the *Comanche* and the spotter aircraft were based in California. California facilities were intended for use in both the landing and selling of their catch. California's interest in defendants' activities was both real and continuing.

 Defendants assert, however, that their convictions are invalid because the FCMA expressly forbids extraterritorial fishing regulation by a state, except in cases where the fishing vessel is "registered under the laws of such State." (16 U.S.C.A. § 1856(a).) Was the *Comanche* so "registered"?

 Both federal and state governments provide various means of identifying and classifying those craft which move in the nation's navigable waters. Under federal law all domestic vessels over five net tons are subject to federal classification. "Registration" is an ancient term of art under the federal scheme, reserved solely for ships which are engaged in foreign trade. (46 U.S.C.A. § 11 et seq.) Those vessels which are engaged in commercial fishing from United States ports, on the other hand, must be "licensed" if over five net tons, and both "licensed" and "enrolled" if over twenty net tons. (*Id.*, §§ 251-263; 46 C.F.R. §§ 67.01-1, 67.01-5, 67.01-11, 67.01-13, 67.07-13.) All boats so "documented" are assigned an official number. (*Id.*, § 67.11-1.)

The term "enrollment" evidences the national character of the vessel enabling it to procure a license. The "license," in turn, limits the commercial use to which the craft may be put in order to prevent evasion of federal revenue laws. (*Douglas* v. *Seacoast Products, Inc., supra*, 431 U.S. 265, 272-273 [52 L.Ed.2d 304, 311-312]; *Anderson* v. *Pacific Coast S. S. Co.* (1912) 225 U.S. 187, 199 [56 L.Ed. 1047, 1053, 32 S.Ct. 626].) Possession of a federal fishing license, however, does not preclude the nondiscriminatory state regulation of the licensed vessel's

fishing activities. (*Douglas, supra*, at p. 277 [52 L.Ed.2d at p. 315]; *Manchester* v. *Massachusetts, supra*, 139 U.S. 240, 265 [35 L.Ed. 159, 167]; *Smith* v. *State of Maryland* (1855) 59 U.S. (18 How.) 71, 74 [15 L.Ed. 269, 270-271].)

■ California provides two means of vessel classification and numbering; an identification number (CF number), and a "certificate of boat registration" with "registration plates." (Fish & G. Code, §§ 7880, 7887.) Such "registration," renewable annually upon payment of a fee (Fish & G. Code, § 7890), constitutes a state license to use the boat for commercial fishing of a specified kind.

■ Defendants urge that because the *Comanche* carried United States documentation, and therefore bore no CF number, it cannot be deemed "registered" in California for purposes of the FCMA. We disagree. In our view, the *Comanche's* California "registration" for commercial swordfishing purposes permitted California to regulate such activities on the high seas. In our view, a contrary interpretation would render FCMA's express recognition of state extraterritorial jurisdiction (16 U.S.C.A. § 1856(a)) virtually meaningless, limiting such jurisdiction to pleasure boats and those few commercial fishing vessels lighter than five net tons.

We also find significance in the fact that, because the federal government has developed no swordfish regulations, the exclusion of any such state regulation would create the danger of wholly unregulated exploitation of that species in coastal waters and on the high seas, thus resulting in the possibility of substantial or, indeed, total depletion of an important natural resource. Had Congress intended by its successive enactments such a drastic curtailment of the states' *Skiriotes* jurisdiction, it would have said so. On the contrary, though undoubtedly aware of various state fishing "registration" schemes such as California's, Congress avoided all reference to the long established terms of art in the federal documentation laws, and premised continued state jurisdiction on the undefined and generic concept of local "registration."

As previously noted, the *Comanche* was licensed for commercial swordfishing. We think our broader interpretation of the term "registration" in FCMA prevents the anomalous result which would follow if the state's extraterritorial jurisdiction over commercial fishing was preserved as to those boats in which the state had asserted only a limited

identification and record-keeping interest, but was precluded as to vessels like the *Comanche* which it has specifically licensed to engage in the activity of swordfishing.

From the foregoing we conclude that section 1856(a), fairly read, is intended to permit a state to regulate and control the fishing of its citizens in adjacent waters, when not in conflict with federal law, when there exists a legitimate and demonstrable state interest served by the regulation, and when the fishing is from vessels which are regulated by it and operated from ports under its authority. (See Fidell, *Enforcement of the Fishery Conservation and Management Act of 1976: The Policeman's Lot* (1977) 52 Wash.L.Rev. 513, 593-597, and fn. 467; cf., *Northwest Trollers Ass'n.* v. *Moos* (1977) 89 Wn.2d 1 [568 P.2d 793, 795].)

We conclude that federal law does not preclude application of California's fishing laws to defendants' activities.

### 3. *Territorial Limits of California Law*

■ Relying on *People* v. *Buffum* (1953) 40 Cal.2d 709 [256 P.2d 317], defendants argue that, apart from any federal conflict, their conduct is not punishable in California as a matter of traditional state law because, standing independently, the violations occurred beyond California territory. However, it is well established that unless the Legislature provides otherwise, those defendants are punishable in California "...who commit, in whole or in part, any crime within..." California. (Pen. Code, § 27, subd. 1.) Similarly, Penal Code section 778a provides, "Whenever a person, with intent to commit a crime, does any act within this state in execution or part execution of such intent, which culminates in the commission of a crime, either within or without this state, such person is punishable for such crime in this state in the same manner as if the same had been committed entirely within this state." Defendants contend that any of their acts which occurred within California were mere preparations and did not constitute technical attempts to violate fishing regulations. (40 Cal.2d at p. 718.)

*Buffum* is inapplicable. The completed violations in the case before us occurred well within the state boundaries as defined by our state Constitution and statutes. (Cal. Const., art. III, § 2; Gov. Code, §§ 170-171, all *supra.*) These are the limits to which the Legislature implicitly intended to extend California's criminal laws, including Fish

and Game Code section 2000. As we have observed, California's territorial boundaries and, therefore, the extent of its criminal jurisdiction are restricted when they conflict with federal and international law. The factual record before us presents no such conflict.

The judgments of conviction are affirmed.

Bird, C. J., Tobriner, J., Clark, J., Manuel, J., and Newman, J., concurred.

**MOSK, J.**—I concur.

Since title to submerged lands in the waters of Santa Barbara Channel was settled in the United States by five votes[1] of the Supreme Court in *United States* v. *California* (1965) 381 U.S. 139 [14 L.Ed.2d 296, 85 S.Ct. 1401], I am under compulsion to accept the result.

I find it difficult to believe, however, that Congress did not intend, when it enacted the Submerged Lands Act, to recognize the respective coastal states' original boundaries. As Justice Black observed in the dissent for himself and Justice Douglas (*id.*, p. 188 [14 L.Ed.2d, p. 326]), during congressional deliberations on the measure the term "historic State boundaries" was used 813 times, "original boundaries" 121 times and "traditional" boundaries 114 times. A cursory examination of appendices A and C to Justice Black's dissent (following p. 213 [14 L.Ed.2d, p. 340]) should convince any objective viewer that the waters within a line from Point Conception to Point Loma are inland waters of California surrounding California territory: San Miguel Island, Santa Rosa Island, Santa Cruz Island, Anacapa Island, Santa Barbara Island, San Nicolas Island, Santa Catalina Island and San Clemente Island.

Rather than to disapprove *People* v. *Foretich* (1970) 14 Cal.App.3d Supp. 6 [92 Cal.Rptr. 481], as the majority do here, I am impressed by its rationale that the high court in *California II* merely defined the limits of a grant of real estate in the Submerged Lands Act and did not clearly intend to alter the political boundaries of the State of California (*id.*, p. 13). (Also see *Alabama* v. *Texas* (1954) 347 U.S. 272 [98 L.Ed. 689, 74 S.Ct. 481].) And as the *Foretich* court pointed out, the high court referred to by name and did not disapprove *People* v. *Stralla*

[1]Chief Justice Warren, who had been Governor of California, and Justice Clark, who had been Attorney General of the United States, did not participate.

(1939) 14 Cal.2d 617 [96 P.2d 941], in which this state's jurisdiction over waters of Santa Monica Bay, from Point Vicente to Point Dume and extending as much as 10 miles from the shoreline, was upheld. Application of the headland-to-headland principle was also approved as to San Francisco Bay in 34 Ops.Cal.Atty.Gen. 260 (1959).

The majority reach the correct conclusion as to the application of California's police power to the waters of Santa Barbara Channel. It is my hope, however, that an opportunity will arise for the State of California to appear again before the Supreme Court on an issue involving its title to submerged lands and political sovereignty over waters from headland to headland within the several bays and channels along our coastline. The high court's more recent deference to states' rights might result next time in a clearer recognition of the traditional coastal boundary of California.

Appellants' petition for a rehearing was denied May 14, 1980.