The Honorable Steven A. Geller Representative, District 101 1250 East Hallendale Beach Boulevard Suite 604 Hallendale, Florida 32309
Dear Representative Geller:
You ask the following questions:
(1) Is a Florida resident prohibited from gambling on the Internet or using a telephone to place bets outside of the state?
(2) May the State of Florida prohibit gambling on cruise ships?
In sum:
(1) Federal law currently prohibits an individual engaged in the business of betting or wagering from using wire communications for the transmission of information that assists in the placing of bets or wagers, while Florida law prohibits an individual within this state from placing a bet or wager. However, evolving technology appears to be far outstripping the ability of government to regulate gambling activities on the Internet and of law enforcement to enforce such regulations. Thus, resolution of these matters must be addressed at the national, if not international, level.
(2) The ability of the state to regulate gambling on cruise ships is dependent upon a variety of factors, including federal law, the registry or ownership of the vessel, and where the gambling activity occurs.
QUESTION ONE
Under Florida law it is illegal to participate in any game of chance for money or other thing of value.[1] Moreover, section849.14, Florida Statutes, provides in pertinent part:
Whoever stakes, bets or wagers any money or other thing of value upon the result of any trial or contest of skill, speed or power or endurance of man or beast . . . or whoever knowingly becomes the custodian or depositary of any money or other thing of value so staked, bet, or wagered upon any such result, . . . shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.
Federal law currently provides:
Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both.[2]
In order for a violation of this federal provision to occur, the transmitted information must have assisted in the placement of bets or wagers and the individual charged must have been engaged in the business of wagering or betting at the time of the offense.[3] While 18 U.S.C. § 1084(b) allows for the transmission in interstate or foreign commerce of information assisting in the placement of bets or wagers on a sporting event or contest from a state or foreign country where such betting is legal into a state or foreign country in which such betting is legal, in light of Florida's prohibition against gambling, the exception would not be applicable to gambling activities in Florida, including those taking place by wire communications or via the Internet.[4]
Thus, federal law would prohibit a bookmaker from transmitting betting or wagering information by wire communication to persons in Florida, while state law would prohibit an individual in Florida from placing a bet or wager by wire communication.
Rapid changes in technology, however, appear to be outstripping both the law and law enforcement's ability to effectively regulate this activity. Due to the changes in technology and the increasing accessibility of the Internet to private individuals via personal computers, it is now possible to use a personal computer to gamble or place bets around the globe.
The Internet is an unregulated world-wide network of computer systems, connected by high-speed wire communications and sharing a common protocol that enables them to communicate with one another. Originally conceived to serve government and educational purposes, the Internet has burgeoned in the last few years as more and more private citizens have obtained access through public employers and commercial service providers. Popularity of the Internet has grown dramatically with the advent of so-called "web browser" programs designed to allow users to more easily navigate the Internet and its graphical component, the World Wide Web. These programs offer users the opportunity to view pictures and hear sounds from around the world, and to move from one location to another simply by highlighting and selecting the destination they wish to visit.
The potential benefits of the Internet and World Wide Web are profound, particularly in the areas of education, commerce, and public access to government records. However, the explosion of Internet usage also carries certain risks, including the means for Floridians to gamble or place bets at "virtual casinos" located in other jurisdictions and accessible only via the Internet. For example, one company located on the Caribbean island of Antigua offers full-service sports betting via an individual's personal computer or telephone; an individual sends the company a deposit and then may place a bet on sporting events by contacting the company by telephone or through the World Wide Web.
Regulation of Internet activity presents an enormous problem. The Internet since inception has been a self-policing operation, but this approach has been severely tested as the Internet has grown to its current size, which is estimated at between 20 and 30 million users,[5] and the unbridled proliferation of subjects available on-line. As Internet technology continues to evolve, the number of users increases exponentially, making it extraordinarily difficult to adopt and implement durable and effective enforcement mechanisms. Without question, technology has jumped ahead of the law and law enforcement.
For example, complex techniques for scrambling or "encrypting" information without providing law enforcement court-authorized access to electronic keys to unlock such information presents a potentially insurmountable obstacle to detection of unlawful activities on the Internet. This rapidly developing encryption technology has surpassed the technology readily available for detection by law enforcement. The federal government continues to struggle, as it has for more than two years, to develop a system guaranteeing law enforcement access to encrypted information with proper court authorization.[6]
Despite the prohibitions against gambling provided by federal and state law, at present the structure and operations of the Internet pose an extraordinary challenge. In fact, determining the actual number of Internet users has proven to be "a daunting challenge given the amorphous nature of cyberspace, with its lack of borders and its culture of anonymity."[7] Although some World Wide Web destination host computers have the capability to record the Internet "address" of users who connect to the site, the ability to retrieve and interpret this data is extremely limited, especially where the host computer is located in a foreign jurisdiction. The technology is such that there may not be a traceable trail; it may therefore be impossible to detect all the wire communication relays that were used to transmit the information.
The Internet is the first truly global communications network, utilizing both interstate and international wire communications to link users around the world. Therefore, any effort to regulate use of the Internet is better suited to federal regulation than to patchwork attention by the individual states. Evolving technology appears to be far outstripping the ability of government to regulate gambling activities on the Internet and of law enforcement to enforce such regulations. Thus, resolution of these matters must be addressed at the national, if not international, level.
QUESTION TWO
Your second question involves issues bearing upon federal jurisdiction with respect to treaties and federal statutes over which the United States Customs Service and other federal authorities exercise enforcement authority. Any comments expressed herein, therefore, must be qualified accordingly.[8]
While federal law regulates gambling on cruise ships in the territorial waters of the United States, it does not appear that such regulation is preemptive, precluding regulation by the state. A number of federal courts, commenting upon federal gambling statutes, have noted that the federal anti-gambling statutes were enacted to assist and aid the anti-gambling laws of the various states.[9] Accordingly, the state would not appear to be precluded from regulating in this area, provided that such laws do not conflict with federal law or treaties.
The Johnson Act, 15 U.S.C. § 1172, makes it unlawful to transport into a state any gambling device unless the state has enacted an exemption to the provisions of the Act.[10] Subsection (c) of15 U.S.C. § 1172, however, provides that the section does not prohibit the transport of a gambling device to a place in a state or a United States possession on a vessel on a voyage if:
(1) the use of the gambling device on a portion of that voyage does not violate 15 U.S.C. § 1175(b), and (2) the gambling device remains on board that vessel while in that state.
Pursuant to 15 U.S.C. § 1175(b)(1), the prohibitions regarding, among other things, the transportation, possession or use of gambling devices contained in that statute do not apply to a vessel under the flag of the United States or foreign nation when
(1) the vessel is not within the boundaries of any state or United States possession, or (2) if the transport or possession of a gambling device on such a vessel is within the boundaries of any state or United States possession, the device is used on that portion of the voyage that is not within the boundaries of any state or the United States possession, and the gambling device remains on board the vessel while the vessel is within the boundaries of that state or United States possession.
If, however, a state or United States possession has enacted a statute that prohibits the repair or use of a gambling device on the voyage, or segment thereof, within its jurisdiction, the exemption afforded by 15 U.S.C. § 1175(b)(1) does not apply.[11]
"Voyage or segment" for purposes of this exception is described as a voyage or segment that begins and ends in the same state or United States possession, during which the vessel does not make an intervening stop within the boundaries of another state, United States possession, or a foreign country.[12]
The federal act, therefore, permits a United States flag vessel or foreign flag vessel to bring a gambling device into the state. The state, however, can prohibit such transport for vessels that leave and return to the state without an intervening stop within another state or foreign destination — what has been dubbed, "cruises to nowhere." Section 849.231, Florida Statutes, exempts vessels of foreign registry or vessels operating under the authority of a country other than the United States from the prohibitions regarding the possession of gambling paraphernalia and gambling equipment contained in the statute (and from section 849.05, Florida Statutes, which provides that gambling apparatus constitutes prima facie evidence that a place is kept for the purpose of gambling).[13] Thus, Florida law currently allows vessels of foreign registry to bring gambling devices into Florida ports, but not vessels of United States registry.
The courts have recognized the right of a state to regulate and control activities by its citizens while on the waters adjacent to, but not within, the state's territorial waters when there is no conflict with federal law, when there exists a legitimate and demonstrable state interest served by the regulation, and when the activity takes place on vessels regulated by the state and operated from its ports.[14] Generally these cases would not provide a basis for the state to exercise jurisdiction outside its territorial waters over vessels of foreign registry.
However, for the so-called "cruises to nowhere" in which interstate or foreign commerce is not implicated, the state may enact, pursuant to the recent amendments to the Johnson Act, legislation that prohibits such vessels, whether under a foreign or American flag, from bringing gambling paraphernalia into the territorial waters of the state. Since such activities are essentially "intrastate," the federal government's interests are limited.[15]
Therefore, "cruises to nowhere," while currently permitted by state law for foreign flag vessels and by federal law for United States flag vessels, can be prohibited. Florida law does not currently distinguish between gambling on vessels used principally for the purpose of gambling and those on which gambling is an incidental or ancillary purpose.[16] In addition to simply prohibiting the "cruises to nowhere," the state could adopt legislation similar to the federal Gambling Ship Act which recognizes such a distinction.
Accordingly, the ability of the state to regulate gambling on cruise ships is dependent upon a variety of factors, including federal law, the registry or ownership of the vessel, and where the activity occurs.
Sincerely,
Robert A. Butterworth Attorney General
RAB/tall
[1] See, s. 849.08, Fla. Stat. (1995), providing that whoever plays or engages in any game at cards, keno, roulette, faro or other game of chance, at any place, by any device whatever, for money or other thing of value, shall be guilty of a misdemeanor of the second degree. See also, Art. X, ss. 7 and 15, Fla. Const., and s. 849.09, Fla. Stat. (1995), prohibiting the operation or conduct of any lottery except the state-run lottery.
[2] 18 U.S.C. § 1084(a).
[3] See, Truchinski v. United States, 393 F.2d 627 (8th Cir. 1968), cert. denied, 393 U.S. 831 (1968); United States v. Alpirn,307 F. Supp. 452 (S.D.N.Y. 1969). And see, Cohen v. United States,378 F.2d 751 (9th Cir. 1967), cert. denied, 389 U.S. 897 (1967) (federal act not intended to be applicable to isolated acts of individuals not engaged in the business of wagering since its purpose is to curb the activities of the professional gamblers).
[4] See, 18 U.S.C. § 1084(c), stating that nothing in the section shall create immunity from criminal prosecution under any laws ofany state.
[5] See, Liu, Peek, Jones, Buus, Nye, Managing Internet Information Services (O'Reilly Associates, Inc., December 1994), estimating approximately 24 million users of the Internet worldwide; and Lohr, Steve, Who Uses Internet? 5.8 Million Are Said to Be Linked in U.S., The New York Times, September 27, 1995, estimating the number of users in the United States, which is believed to comprise approximately half of the worldwide users, to be 5.8 million direct users of the Internet with another 3.9 million users through commercial on-line services.
[6] Corcoran, Elizabeth, White House to Unveil Data Encryption Plan Export of Scrambling' Technologies Allowed, The Washington Post,, August 17, 1995.
[7] Lohr, Steve, Who Uses Internet? 5.8 Million Are Said to Be Linked in U.S., supra.
[8] See, e.g., Art. I, s. 8, U.S. Const. ("Congress shall have Power . . . To regulate Commerce with foreign Nations. . . ."); Art. VI, cl. 2, U.S. Const., stating in part:
This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
[9] See, e.g., United States v. Black, 291 F. Supp. 262 (E.D.N Y 1968); United States v. 420 Gambling Devices, 191 F. Supp. 111, 115
(E.D.N.Y. 1961). And see, Opinion Letter to Janet Reno from Joseph McSorley, Chief Assistant, United States Attorney, Southern District of Florida, dated October 21, 1986; Opinion Letter to Edwin L. Miller, Jr., District Attorney, from California Attorney General John K. Van De Kamp, dated March 22, 1984.
[10] 15 U.S.C. § 1172(a).
[11] 15 U.S.C. § 1175(b)(2)(A).
[12] 15 U.S.C. § 1175(b)(2)(B).
[13] Prior to the adoption of this exemption in 1987, see, s. 2, Ch. 87-255, Laws of Florida, this office noted that the United States Customs Service had taken the position that gambling equipment and paraphernalia on board a vessel of foreign registry are not within a state's jurisdiction until they first come into and pass out of Customs Service jurisdiction. Since the Customs Service has concluded that gambling devices are "vessel equipment" or "ship's equipment" under pertinent maritime treaties, they are not subject to Customs Service jurisdiction. Such equipment of a foreign registry vessel, therefore, does not come within the jurisdiction of the state. See, Informal Opinion to Curtis Golden, dated May 1, 1986.
[14] See, Skiriotes v. Florida, 313 U.S. 69 (1941); People v. Weeren, 26 Cal.3d 654 (1980).
[15] Cf., United States v. Montford, 27 F.3d 137 (5th Cir. 1994), in which the court held that a gambling ship's "cruise to nowhere," on which the vessel had no contact with another state or foreign country or waters within the jurisdiction of another state or foreign country, did not involve interstate or foreign commerce.
[16] Federal law recognizes such a distinction. The Gambling Ship Act, 18 U.S.C. ss. 1081-1083, is applicable to gambling ships, which the act defines as "vessel[s] used principally for the operation of one or more gambling establishments."18 U.S.C. § 1081.