# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PACIFIC MERCHANT SHIPPING
ASSOCIATION,
        *Plaintiff-Appellant,*

        v.

JAMES GOLDSTENE, in his official
capacity as Executive Officer of
the California Air Resources
Board,
        *Defendant-Appellee.*

NATURAL RESOURCES DEFENSE
COUNCIL, INC.; COALITION FOR
CLEAN AIR, INC.; SOUTH COAST AIR
QUALITY MANAGEMENT DISTRICT,
   *Defendant-Intervenors-Appellees.*

No. 09-17765

D.C. No.
2:09-cv-01151-
MCE-EFB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Jr., District Judge, Presiding

Argued and Submitted
December 9, 2010—San Francisco, California

Filed March 28, 2011

Before: Robert E. Cowen,* A. Wallace Tashima, and
Barry G. Silverman Circuit Judges.

Opinion by Judge Cowen

---

*The Honorable Robert E. Cowen, Senior United States Circuit Judge
for the Third Circuit, sitting by designation.

## COUNSEL

Aleksandrs Drumalds & Erich Wise (argued), Flynn, Delich & Wise, Long Beach, California, for the appellant.

Nicholas Stern (argued), Office of the California Attorney General, Sacramento, California; for appellee James Goldstene; Melissa Lin Perrella & David Richard Petit; National Resources Defense Council, Santa Monica, California, for appellees National Resources Defense Council, Inc. and Coalition for Clean Air, Inc.; Barbara B. Baird (argued), South Coast Air Quality Management District, Diamond Bar, California, for appellee South Coast Air Quality Management District.

## OPINION

COWEN, Circuit Judge:

In this interlocutory appeal, Plaintiff Pacific Merchant Shipping Association ("PMSA") appeals from the District

Court's denial of its motion for summary judgment in its action against Defendant James Goldstene, the Executive Officer of the California Air Resources Board ("CARB"). PMSA has challenged, on federal statutory and constitutional grounds, California fuel use regulations (known as the "Vessel Fuel Rules") insofar as they purport to apply to sea-going vessels located more than 3 miles from the California coast. We will affirm.

I.

On April 16, 2009, CARB transmitted the "Vessel Fuel Rules" to the California Secretary of State for filing pursuant to state law, and the regulations went into effect as planned on July 1, 2009. As the District Court noted, the express purpose of the Vessel Fuel Rules "is to reduce air pollutants affecting the State of California by requiring ocean-going vessels to use cleaner marine fuels." (ER24 (footnote added).) The regulations were adopted only after a lengthy process that included consultation with the public, state and local agencies, and the federal government.

The Vessel Fuel Rules mandate that vessel operators "use cleaner marine fuels in diesel and diesel-electric engines, main propulsion engines, and auxiliary boilers on vessels operating within twenty-four nautical miles off the California coastline." (*Id.* (citing Cal. Code Regs. tit. 13, § 2299.2(a); Cal. Code Regs. tit. 17, § 93118.2(a)).) Specifically, the regulations apply to a geographical region known as "Regulated California Waters," which includes the waters within 24 nautical miles of the state's shoreline. Cal. Code Regs. tit. 13, § 2299.2(b); Cal. Code Regs. tit. 17, § 93118.2(b). This area evidently encompasses approximately 14,000 square miles of ocean beyond the 3-mile zone immediately adjacent to the coast. In general, the Vessel Fuel Rules only cover vessels calling at a California port, and they accordingly contain an express exemption for vessels simply traveling through the region (known as "innocent passage"). There are two phases

of implementation: (1) "Initially, beginning in July 2009, vehicle operators must use either marine gas oil (which typically averages 0.3% sulfur and is capped at 1.5%), or marine diesel oil with a sulfur limit of 0.5% or less;" and (2) "Thereafter, by January 2012, both fuels must not exceed 0.1% sulfur." (ER24 (citing Cal. Code Regs. tit. 13, § 2299.2(a); Cal. Code Regs. tit. 17, § 93118.2(a)).) The regulations also require vessel owners and operators to keep detailed records, and non-compliance could subject such owners and operators to a wide range of sanctions, including fines, injunctive relief, and criminal prosecution. The Vessel Fuel Rules contain an express "sunset" clause, providing for their termination when CARB's Executive Officer makes a finding that the federal government has adopted and is enforcing requirements that will achieve equivalent emission reductions.

Prior to the 2009 adoption and implementation of the Vessel Fuel Rules, CARB previously adopted a set of emission standards for ocean-going vessels. In *PMSA v. Goldstene*, 517 F.3d 1108 (9th Cir. 2008), we observed that CARB on January 1, 2007 began enforcing its "Marine Vessel Rules," limiting "emissions from the auxiliary diesel engines of ocean-going vessels within twenty-four miles of California's coast," *id.* at 1109. PMSA claimed that the Marine Vessel Rules were preempted by two federal statutes: the Clean Air Act and the Submerged Lands Act ("SLA"). *Id.* at 1109-13. Affirming the district court's ruling and reinstating the injunction entered against the regulations' enforcement, we held that the Marine Vessel Rules were emission standards (as opposed to otherwise permissible in-use fuel requirements) and thereby were preempted by the Clean Air Act. *Id.* at 1109-15. We accordingly found "it unnecessary to decide whether the Submerged Lands Act also preempts the state rules at issue." *Id.* at 1115. In turn, CARB carefully drafted the current Vessel Fuel Rules to require the use of particular fuels in order to correct the deficiency we identified in *Goldstene*.

With respect to these Vessel Fuel Rules, the District Court as well as the parties have addressed in some detail the seri-

ous environmental problems giving rise to these regulations as well as the various positive and negative effects of this regulatory scheme.

Initially, the ports of Long Beach and Los Angeles collectively constitute the largest port in the United States, with some 40% of all national imports entering the country through these two huge facilities. In 2006 alone, there were approximately 11,000 vessel "calls" at California ports, and this number is expected to increase significantly in the future.

CARB estimated that compliance with the Vessel Fuel Rules would cost ship operators $30,000.00 per California port "call," amounting to an industry-wide aggregate incremental cost of approximately $360 million annually and $1.5 billion through the end of 2014. On the other hand, it does not appear that such compliance would be technically impossible or even especially challenging. As the District Court emphasized in its decision, "any increased cost associated with compliance is less than one percent of the typical cost of a trans-Pacific voyage." (ER36 (citing SER42).) "That cost has been estimated by CARB to amount to only a $6.00 increase per 20-foot shipping container, a sum that would equate to only an extra 12.5 cents in the cost of a plasma TV" or about 0.14 cents for a pair of athletic shoes (*Id.* (citing same).)

It appears uncontested that ocean-going vessels have long been a leading source of air pollution in California, due in large part to the widespread use of low-grade bunker fuel. Bunker fuel consists primarily of a thick and tar-like residual formulated from the residues remaining after primary fuel distillation. Because of its high viscosity, this fuel has to be heated before it can be pumped and injected into an engine. It contains an average of approximately 25,000 parts per million ("ppm") of sulfur. In contrast, the diesel fuel used for trucks and other motor vehicles is limited to just 15 ppm of sulfur.

2006 data from CARB indicated that ocean-going vessels traveling within 24 nautical miles of the California coast generate per day approximately 15 tons of diesel particulate matter ("PM"), 157 tons of nitrogen oxides ("NOx"), and 117 tons of sulfur oxides ("SOx"). In fact, their emissions constitute the single largest source of SOx emissions in the state, responsible for 40% of all such emissions. Furthermore, both NOx and SOx are precursors to PM2.5, or fine particulate pollution. It was estimated that the vessels' daily PM emissions represent the equivalent of approximately 150,000 big rig trucks traveling 125 miles per day. It appears that emissions are likely to be blown on-shore from beyond the geographical area actually covered by the Vessel Fuel Rules.

It is likewise undisputed that 27 million Californians (80% of the state's population) are exposed to emissions from ocean-going vessels and that these emissions have a number of harmful effects. In particular, diesel emissions are known to cause cancer and respiratory illnesses like aggravated asthma as well as to increase the risk of heart disease. CARB specifically estimated that the vessels' direct PM emissions cause 300 premature deaths across the state every single year, even after excluding cancer effects.

These various public health problems are especially severe in the area of Southern California known as the South Coast Air Basin (which encompasses all of Orange County as well as the non-desert portions of Los Angeles, Riverside, and San Bernardino Counties). For instance, over 80% of the population in the South Coast Air Basin is exposed to PM2.5 levels exceeding federal ambient air quality standards.

Implementation of the Vessel Fuel Rules should reduce PM emissions by approximately 13 tons per day, NOx emissions by 10 tons per day, and SOx emissions by 109 tons per day. Upon full implementation, the amount of SOx in the air should be cut by approximately 90%. In addition to anticipated health care savings and similar financial benefits,

research indicated that the Vessel Fuel Rules should prevent, between 2009 and 2015, approximately 3,500 premature deaths and nearly 100,000 asthma attacks as well as reduce cancer risks.

The South Coast Air Basin has long been unable to meet federal air quality standards. As a practical matter, the Vessel Fuel Rules appear to be critical to ongoing efforts at compliance. Among other things, the Clean Air Act requires Defendant-Intervenor South Coast Air Quality Management District[1] ("South Coast District") to achieve national ambient air quality standards for PM2.5, and, in order to do so, it evidently needs SOx reductions of nearly 70% by 2014. However, "[m]ost of the pollution reductions the South Coast District relies on to attain the standard come from these CARB rules," and the South Coast District therefore claims that it would be impossible to comply with federal law without these regulations. (South Coast District's Brief at 6 (citing SER144).) Failure to comply with federal mandates could result in the EPA imposing various sanctions, including the reduction or termination of federal transportation funding for the region.

On March 27, 2009 (after this litigation commenced but before the District Court ruled on PMSA's summary judgment motion), Canada and the United States jointly proposed, pursuant to the procedures established by the International Maritime Organization ("IMO"), that an Emissions Control Area ("ECA") be established under Annex VI of the International Convention for the Prevention of Pollution from Ships ("MARPOL"). The IMO, which is responsible for administering the treaty, evidently adopted the joint proposal on March 26, 2010 (following the filing of this current appeal). This action makes the ECA binding on all treaty signatories. It is

---

[1]The South Coast District has joint responsibility, along with CARB, for the South Coast Air Basin. The District, which also includes the Palm Springs area, is home to over 16 million people.

anticipated that, as of August 2012, vessels subject to Annex VI and located within 200 nautical miles of the territorial sea baselines of Canada and the United States will be required to comply with a 1% sulfur limit. The ECA will then evidently require these vessels to meet the same 0.1% sulfur limit established by the Vessel Fuel Rules beginning in 2015.

PMSA is a California mutual benefit corporation whose members own and operate both United States and foreign-flagged ocean-going vessels. It filed its complaint in the United States District Court for the Eastern District of California on April 27, 2009, naming Goldstene (acting in his official capacity) as the sole Defendant. The pleading contained a single claim for relief with the heading: "[For Declaratory And Injunctive Relief Based On Preemption By The Submerged Lands Act, 43 U.S.C. § 1301 *et seq*.]" (ER45 (emphasis omitted).) PMSA specifically alleged, inter alia, that it "is entitled to a judgment that enjoins defendant Goldstene from giving effect or enforcing 13 CCR § 2299.2 and 19 CCR § 93118.1 seaward of California's boundary as established by the Submerged Lands Act and declares these regulations preempted by the Commerce Clause of the United States Constitution, and contrary to the Supremacy Clause of the United States Constitution." (ER46.) PMSA accordingly sought a declaration to the effect "that, insofar as they regulate conduct seaward of California's three-mile boundary," the Vessel Fuel Rules are preempted by the SLA and otherwise "impermissibly regulate navigation and foreign and domestic commerce as delegated to the United State Congress by Article I, Section 8, Clause 3 of the Constitution." (*Id.*) PMSA further sought a permanent injunction barring the implementation or enforcement of the Vessel Fuel Rules as to conduct seaward of California's 3-mile boundary.

The District Court allowed the South Coast District as well as the National Resources Defense Council, Inc. and the Coalition for Clean Air, Inc. to intervene in this action as Defendants. PMSA moved for summary judgment. In a mem-

orandum and order filed on June 30, 2009, the District Court denied PMSA's summary judgment motion. In short, the District Court: (1) applied the general presumption against federal preemption; (2) determined that the Vessel Fuel Rules are not preempted by the SLA; (3) based in particular on its application of the "so-called 'effects test,' " rejected PMSA's theory that the regulations "are otherwise 'unlawful and impermissibly regulate navigation and foreign commerce as delegated to the United States Congress,' or are 'contrary to law.' " (ER16-ER17 (quoting ER46)); and (4) otherwise observed that, pursuant to the Clean Air Act, states are permitted to adopt their own fuel mandates.

PMSA responded to the District Court's ruling by filing a motion for modification and for permission to take an interlocutory appeal. Although the motion was contested, the District Court filed an amended memorandum and order on August 28, 2009, certifying that "this Order qualifies for immediate appellate review as involving 'a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.' " (ER42 (quoting 28 U.S.C. § 1292(b)).) PMSA filed a timely petition for permission to appeal, which was granted by this Court on December 11, 2009, and PMSA then successfully perfected the appeal.

II.

It is uncontested that the District Court possessed federal question jurisdiction over this mater pursuant to 28 U.S.C. § 1331 and that we have appellate jurisdiction over the current interlocutory appeal under 28 U.S.C. § 1292(b).

A district court's denial of summary judgment is reviewed de novo. *See, e.g.*, *Botosan v. Paul McNally Realty*, 216 F.3d 827, 830 (9th Cir. 2000). We must determine whether, viewing the evidence in the light most favorable to the non-moving

party, there are any genuine issues of material fact and whether the district court properly applied the correct legal principles. *See, e.g.*, *Prison Legal News v. Lehman*, 397 F.3d 692, 698 (9th Cir. 2005). We also may affirm on any ground supported by the record. *See, e.g.*, *Levine v. Vilsack*, 587 F.3d 986, 991 (9th Cir. 2009).

We find that the related dormant Commerce Clause and general maritime law preemption claims were preserved and are now properly before us. PMSA sought declaratory and injunctive relief in the District Court on the grounds that the Vessel Fuel Rules, insofar as they purport to regulate conduct seaward of California's 3-mile boundary, are preempted by the SLA and unlawfully and impermissibly regulate navigation and both foreign and domestic interstate commerce. The District Court in turn determined that PMSA failed to demonstrate that the California regulations "are otherwise 'unlawful and impermissibly regulate navigation and foreign and domestic commerce as delegated to the United States Congress.' " (ER37 (quoting ER46).) Finally, we observe that, as a practical matter, the statutory preemption, dormant Commerce Clause, and general maritime law preemption theories presented in this appeal are quite similar.

III.

This appeal presents the Court with a highly unusual and challenging set of circumstances. Given the circumstances, we do believe that the regulatory scheme at issue here pushes a state's legal authority to its very limits, although the state had clear justifications for doing so. More generally, we must take into account such fundamental considerations as, on the one hand, the supremacy of federal law, the various limitations on state regulations arising out of the dormant Commerce Clause and general maritime law preemption doctrines, and the federal government's unquestioned authority over this nation's relations with foreign countries, and, on the other hand, the sovereign police powers retained by California

allowing the state to adopt a wide range of laws in order to protect the health, safety, and welfare of its own residents.

Having fully considered the numerous arguments raised by the parties, the record on appeal, the District Court's own reasoning, and the governing legal principles, we ultimately determine that the District Court properly denied PMSA's motion for summary judgment. In particular, PMSA fails to establish that the Vessel Fuel Rules are preempted by the SLA. PMSA also fails to show that it is entitled to summary judgment on the basis that the Vessel Fuel Rules "are otherwise 'unlawful and impermissibly regulate navigation and foreign and domestic commerce as delegated to the United States Congress.' " (ER37 (quoting ER46).)

## A.    Statutory Preemption Under The SLA

In this appeal, PMSA primarily relies on a theory of statutory preemption, asserting that the Vessel Fuel Rules are preempted by the SLA. We therefore are directly confronted with the question we refrained from deciding in *Goldstene*.

The SLA arose out of a number of rulings by the United States Supreme Court primarily deciding who owns the submerged lands (and the oil and other natural resources contained in these lands) off the coasts of the United States. In particular, the Supreme Court held in *United States v. California*, 332 U.S. 19 (1947) ("*California I*"), that "California is not the owner of the three-mile marginal belt along its coast, and that the Federal Government rather than the state has paramount rights in and power over that belt, an incident to which is full dominion over the resources of the soil under that water area, including oil," *id.* at 38-39; *see also, e.g.*, *United States v. Louisiana*, 339 U.S. 699, 704-06 (1950) ("*Louisiana I*").

**[1]** "The Submerged Lands Act, 67 Stat. 29, 43 U.S.C. § 1301 *et seq.*, passed May 22, 1953, came in response to

these rulings." *United States v. Louisiana*, 446 U.S. 253, 256 (1980) ("*Louisiana III*"). "By that statute, the United States released to the coastal States its rights in the submerged lands within stated limits and confirmed its own rights therein seaward of those limits." *Id.* The Supreme Court upheld this legislation as a constitutional exercise of Congress's power to dispose of federal property under Article IV, Section 3, Clause 2 of the Constitution. *See, e.g. id.* (citing *Alabama v. Texas*, 347 U.S. 272 (1954)); *United States v. Louisiana*, 363 U.S. 1, 7 (1960) ("*Louisiana II*") (citing same). We point out that the Supreme Court itself has also indicated that Congress thereby did not technically overrule or otherwise reject the Court's own prior case law. *See, e.g.*, *United States v. Maine*, 420 U.S. 515, 524 (1975) ("*Maine I*") ("It is also our view, contrary to the contentions of the States, that the premise [that paramount rights to the offshore seabed inhere in the federal government as an incident of national sovereignty] was embraced rather than repudiated by Congress in the Submerged Lands Act of 1953, 67 Stat. 29, 43 U.S.C. § 1301."); *Louisiana II*, 363 U.S. at 7 (stating that "the Act concededly did not impair the validity of the California, Louisiana, and Texas cases, which are admittedly applicable to all coastal States"). However, as a practical matter, the legislation still transferred federal rights in the marginal seas to the respective states. *See, e.g.*, *Maine I*, 420 U.S. at 524 ("In that legislation, it is true, Congress transferred to the States the rights to the seabed underlying the marginal sea; however, this transfer was in no wise inconsistent with paramount national power but was merely an exercise of that authority."); *Louisiana II*, 363 U.S. at 6 ("[T]his case draws in question only the geographic extent to which the statute ceded to the States the federal rights established by those [pre-SLA] decisions."); *Barber v. Hawai'i*, 42 F.3d 1185, 1190 (9th Cir. 1994) ("In 1953, Congress passed the Submerged Lands Act to negate the Supreme Court's ruling [in *California I*.]").

In *United States v. Louisiana*, 363 U.S. 1 (1960) ("*Louisiana II*"), the Supreme Court observed that "the pur-

poses of the Submerged Lands Act are described in its title as follows:"

> 'To confirm and establish the titles of the States to lands beneath navigable waters within State boundaries and to the natural resources within such lands and waters, to provide for the use and control of said lands and resources, and to confirm the jurisdiction and control of the United States over the natural resources of the seabed of the Continental Shelf seaward of State boundaries.'

*Id.* at 8. The *Louisiana II* Court then stated that the legislation promotes these purposes in the following ways:

> 1.  relinquishes to the States the entire interest of the United States in all lands beneath navigable waters within state boundaries. (s 3, 43 U.S.C. s 1311, 43 U.S.C.A. s 1311);
>
> 2.  defines that area in terms of state boundaries 'as they existed at the time (a) State became a member of the Union, or as heretofore approved by Congress,' not extending, however, seaward from the coast of any State more than three marine leagues in the Gulf of Mexico or more than three geographical miles in the Atlantic and Pacific Oceans (s 2, 43 U.S.C. s 1301, 43 U.S.C.A. s 1301);
>
> 3.  confirms to each State a seaward boundary of three geographical miles, without 'questioning or in any manner prejudicing the existence of any State's seaward boundary beyond three geographical miles if it was so provided by its constitution or laws prior to or at the time such State became a member of the Union, or if it has been heretofore approved by Congress' (s 4, 43 U.S.C. s 1312, 43 U.S.C.A. s 1312); and

4. For purposes of commerce, navigation, national defense, and international affairs, reserves to the United States all constitutional powers of regulation and control over the areas within which the proprietary interests of the States are recognized (s 6(a), 43 U.S.C. s 1314, 43 U.S.C.A. s 1314); and retains in the United States all rights in submerged lands lying beyond those areas to the seaward limits of the Continental Shelf (s 9, 43 U.S.C. s 1302, 43 U.S.C.A. s 1302).

*Id.* at 8-10 (footnotes omitted).

**[2]** PMSA specifically emphasizes § 1312, which is entitled "Seaward boundaries of States." This provision states in full that:

The seaward boundary of each original coastal State is approved and confirmed as a line three geographical miles distant from its coast line or, in the case of the Great Lakes, to the international boundary. Any State admitted subsequent to the formation of the Union which has not already done so may extend its seaward boundaries to a line three geographical miles distant from its coast line, or to the international boundaries of the United States in the Great Lakes or any other body of water traversed by such boundaries. Any claim heretofore or hereafter asserted either by constitutional provision, statute, or otherwise, indicating the intent of a State so to extend its boundaries is approved and confirmed, without prejudice to its claim, if any it has, that its boundaries extend beyond that line. Nothing in this section is to be construed as questioning or in any manner prejudicing the existence of any State's seaward boundary beyond three geographical miles if it was so provided by its constitution or laws prior to or at the time such State became a member of the

Union, or if it has been heretofore approved by Congress.

It is uncontested that, as the District Court noted, California law "previously delineated California's sea boundary as extending three miles into the Pacific Ocean (*see People v. Weeren*, 26 Cal. 3d 654, 660 (1980))." (ER30.)

The Supreme Court has further indicated that § 1312 specifically arises out of Congress's power to admit states pursuant to Article IV, Section 3, Clause 1 of the Constitution. According to the *Louisiana II* Court, the admission power gives rise to Congress's authority to establish state boundaries for all domestic purposes (in contrast to the President's power as the constitutional representative of this nation in foreign affairs to determine how far this country will claim territorial rights as against other countries). *Louisiana II*, 363 U.S. at 35. In other words, such state boundaries established by Congress are "fully effective as between Nation and State." *Id.*

## 1.   The Doctrine Of Implicit Field Preemption And The General Presumption Against Preemption

PMSA does not argue that the Vessel Fuel Rules are expressly preempted by any federal statute, and it instead relies on the doctrine of implicit field preemption. The principles governing this doctrine appear to be relatively easy to state, although they seem to be rather difficult to apply in practice. We agree with the District Court that it is appropriate to apply the otherwise well-established presumption against preemption in the current circumstances. In turn, the application of such a presumption in this matter clearly weighs against PMSA's position.

Field preemption arises when state law "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). "We will find implicit preemption where the intent

of Congress is clearly manifested, or implicit from a pervasive scheme of federal regulation that leaves no room for state and local supplementation, or implicit from the fact that the federal law touches a field (e.g. foreign affairs) in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " *Barber*, 42 F.3d at 1189 (quoting *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604-05 (1991)). In deciding whether a federal law preempts a state counterpart, our only task is to ascertain the intent of Congress. *See, e.g.*, *PMSA v. Aubry*, 918 F.2d 1409, 1415 (9th Cir. 1990) (quoting *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280 (1987)).

PMSA contends that the 3-mile boundary purportedly established by the SLA constitutes a component of a comprehensive federal scheme and that the SLA "statutorily demarcates the territorial boundaries of the states for purposes of federal law." (Appellant's Brief at 20.) In other words, the powers of the states are subordinated even within their respective territorial boundaries, and they, in turn, lack any powers whatsoever (with a few possible narrow exceptions) beyond such boundaries in waters in which the federal government's own powers are "exclusive." (*Id.*) According to PMSA, Congress purportedly legislated on a matter in which the federal interest is so dominant that it must be assumed that enforcement of state law on the same subject is precluded. PMSA goes on to argue that the Vessel Fuel Rules "assert the territorial dominion of California out to 24 miles" and thereby venture into a field comprehensively settled by Congress in the SLA—"the definition of a state's territorial seas." (Appellant's Reply Brief at 9.)

In conducting its preemption analysis, the District Court expressly relied on the general presumption against preemption. It recognized that "a presumption applies to protect a state's historic police power in protecting the health and safety of its citizenry, unless the clear and manifest purpose of Congress dictates otherwise." (ER33 (citing *Rice v. Santa*

*Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). PMSA vigor-ously contends that the presumption does not apply in this case, relying in particular on the Supreme Court's opinion in *United States v. Locke*, 529 U.S. 89 (2000).

The *Locke* Court ruled that certain components of Washington's regulatory scheme governing oil tankers in Puget Sound were preempted by the Ports and Waterways Safety Act of 1972 ("PWSA") and another federal statute (specifically striking down state crew training requirements, an English language proficiency mandate for tanker crew members, a navigation watch requirement, and marine casualty reporting requirements) and remanded for further consideration of the remaining state-law provisions. *Id.* at 99-117. It specifically rejected our broad application of the *"Rice* assumption" on the grounds that "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *Id.* at 108 (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Applying this approach, the *Locke* Court determined that the presumption (or "assumption") was inapplicable:

> The state laws now in question bear upon national and international maritime commerce, and in this area there is no beginning assumption that concur-rent regulation by the State is a valid exercise of its police powers. Rather, we must ask whether the local laws in question are consistent with the federal statu-tory structure, which has as one of its objectives a uniformity of regulation for maritime commerce. No artificial presumption aids us in determining the scope of appropriate local regulation under the PWSA, which, as we discuss below, does preserve, in Title I of that Act, the historic role of the States to regulate local ports and waters under appropriate circumstances. At the same time, as we also discuss below, uniform, national rules regarding general

tanker design, operation, and seaworthiness have been mandated by Title II of the PWSA.

*Id.* at 108-09; *see also Fednav, Ltd. v. Chester*, 547 F.3d 607, 622 (6th Cir. 2008) (refraining from applying any " 'beginning assumption' " with respect to Michigan's ballast statute).

**[3]** The Supreme Court, however, further explained the proper scope of this presumption against preemption in *Wyeth v. Levine*, 129 S. Ct. 1187 (2009). In this 2009 decision, the Court rejected the theory that the FDA's approval of drug warning labels furnished the drug manufacturer with a complete defense to state tort claims for failure to provide an adequate warning. *Id.* at 1193-1204. The Supreme Court expressly applied the beginning assumption against preemption. *Id.* at 1194-95. In a footnote, it considered but rejected the manufacturer's contention that the presumption should not apply at all because the federal government has regulated drug labeling for more than a century. *Id.* at 1195 n.3. Stating that this argument was based on a misunderstanding of the governing principle, the *Wyeth* Court explained that "[w]e rely on the presumption because respect for the States as 'independent sovereigns in our federal system' leads us to assume that 'Congress does not cavalierly pre-empt state law causes of action.' " *Id.* (quoting *Medtronic, Inc.*, 518 U.S. at 485). Specifically, the presumption thereby "accounts for the historic presence of state law but does not rely on the absence of federal regulation." *Id.*

**[4]** While PMSA contends that the Vessel Fuel Rules operate in fields historically occupied by the federal government (e.g., maritime commerce, conduct at sea outside of state boundaries, and the definition of state boundaries), we agree with the District Court that these state regulations ultimately implicate the prevention and control of air pollution. States have long sought to protect their own residents from the undisputedly harmful effects of air pollution and other forms of environmental harms. In its 1960 ruling in *Huron Portland*

*Cement Co. v. City of Detroit*, 362 U.S. 440 (1960), the Supreme Court observed that "[l]egislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power," *id.* at 442. Likewise, this Court more recently stated that "[a]ir pollution prevention falls under the broad police powers of the states, which include the power to protect the health of citizens in the state" and that "[e]nvironmental regulation traditionally has been a matter of state authority." *Exxon Mobil Corp. v. U.S. EPA*, 217 F.3d 1246, 1255 (9th Cir. 2000) (citing *Massachusetts v. U.S. Dep't of Transp.*, 93 F.3d 890, 894 (D.C. Cir. 1996)). Congress itself contemplated that the states would retain leading roles in regulating air quality when it passed the Clean Air Act. *See, e.g.*, *id.* at 1254-55. While we acknowledge that the state regulatory scheme at issue in *Locke* likewise sought to protect the environment, we find it significant that the Washington state law addressed the same subject and had the same purpose, namely the prevention of oil tanker accidents, as the federal legislation. As explained in more detail in Section III.A.2., *infra*, we are not faced with the same kind of situation here with respect to the Vessel Fuel Rules and the SLA.

**[5]** Given the "historic presence of state law" in the area of air pollution, we apply the well-established presumption or assumption against preemption in the current appeal. *See, e.g.*, *Kroske v. US Bank Corp.*, 432 F.3d 976, 981 (9th Cir. 2005) ("Here, although we recognize that there is a significant federal presence in the regulation of national banks, WLAD ("Washington Law Against Discrimination") was enacted pursuant to the State's historic police powers to prohibit discrimination on specified grounds. Thus, we begin with the presumption that Congress did not intend the National Bank Act to preempt the WLAD." (citations omitted)).

## 2.    The SLA Does Not Preempt The Vessel Fuel Rules

Especially in light of this applicable presumption, we believe that the District Court properly rejected PMSA's

whole theory of implied preemption. Simply put, PMSA reads too much into the SLA itself and what Congress itself intended to achieve in 1953. We instead conclude that, at the very least, a state law regulating extraterritorial conduct in the high seas immediately adjacent to the state's territorial waters satisfying the well-established effects test should generally be sustained. Applying this effects test to the Vessel Fuel Rules, we conclude that there are genuine issues of material fact with respect to both the effects of the fuel use governed by California's regulations on the health and well-being of the state's residents as well as the actual impact of these regulations on maritime and foreign commerce.

[6] Initially, we reject PMSA's unfounded characterization of the Vessel Fuel Rules as amounting to some sort of territorial claim on the part of California. While the regulations do use, inter alia, the term "Regulated California Waters" and thereby set out precise geographical coordinates and descriptions (understandably so given that vessel owners and operators need to know when they must comply with the fuel use requirements), CARB, as a mere state administrative agency, does not actually purport to extend the borders of California. It merely seeks to regulate conduct beyond the state's territorial boundaries because of the serious harmful effects of this conduct on the state and its residents. It therefore does not invade or interfere with either Congress's power to set state territorial boundaries for domestic purposes or the President's power "to determine how far this country will claim territorial rights . . . as against other nations." *Louisiana II*, 363 U.S. at 35.

Turning specifically to the SLA itself, we must approach this legislation in light of the line of Supreme Court cases beginning with *California I*.

On the one hand, we do acknowledge that the initial holding in *California I* was premised on the fundamental principle that the federal government possesses paramount rights over

the marginal seas. For instance, the *California I* Court noted that the "protection and control of [the 3-mile belt] has been and is a function of national external sovereignty" and that a national government "must have powers of dominion and regulation in the interests of its revenues, its health, and the security of its people from [war] waged on or too near its coasts." *California I*, 332 U.S. at 35-36 (citations omitted). In *Barber v. Hawai'i*, 42 F.3d 1185 (1994), we stated that the *California I* Court thereby recognized the federal government as the exclusive owner of submerged lands and the waters above them within the 3-mile belt and that, "[c]onsequently, before the Submerged Lands Act, the states' jurisdiction ended at the low-tide mark of their tidal shores," *id.* at 1190. The SLA, in turn, expressly reserves to the United States concurrent jurisdiction over the waters within this belt for purposes of commerce, navigation, national defense, and international affairs. *See, e.g.*, 43 U.S.C. § 1314; *Barber*, 42 F.3d at 1190-91 (discussing 43 U.S.C. § 1311(d)).

The Court in *Louisiana II* further indicated that § 1312 constitutes an exercise of Congress's power to admit new states and thereby set state boundaries. *Louisiana II*, 363 U.S. at 35. Accordingly, it appears that at least one component (the component of greatest significance in this case) of the SLA involves more than a mere transfer of property. Such a broader approach was apparently taken by the California Supreme Court in *People v. Weeren*, 26 Cal. 3d 654 (1980). Among other things, the state court quoted the language from *Louisiana II* regarding the exercise of Congress's power to admit new states and set state boundaries. *Id.* at 660 (quoting *Louisiana II*, 363 U.S. at 35). It then stated that:

> We are unable to accept the People's argument that the effect of [*United States v. California*, 381 U.S. 139 (1965) ("*California II*"),] is limited solely to issues involving land title which are governed by the Act and that the high court's holding, accordingly, is therefore inapplicable to California's *politi-*

*cal* and penal jurisdiction over adjacent seas. Fairly read, *California II* established the state's "boundaries" for *all* purposes, political and proprietary, "as between Nation and State." Accordingly, these "boundaries" are those "boundaries" referred to in the [Fishery Conservation and Management Act of 1976] as the limits of state territorial jurisdiction over fishing . . . .

*Id.* at 662. The California Supreme Court subsequently added that the SLA itself is premised on the underlying principle that all states possess a single and fixed seaward boundary for all domestic purposes. *Id.* at 664. Despite this conclusion regarding the location of the state's borders, the *Weeren* Court ultimately upheld the extraterritorial application of California's fishing regulations. *Id.* at 666-69.

Similarly, the United States Supreme Court in *United States v. Maine*, 469 U.S. 504 (1985) ("*Maine II*"), noted in passing that "[t]he location of a State's boundary also may be relevant in determining the State's right to regulate navigation" and then pointed to both Congress's plenary right to regulate navigation under the Commerce Clause as well as a long-standing federal statute giving the states the right to regulate pilotage in the bays, inlets, rivers, harbors, and ports of the United States, *id.* at 513 n.6.

We, however, must not overlook the fact that the Supreme Court's various rulings, decided under the Court's original jurisdiction pursuant to Article III of the Constitution, specifically addressed the distinct question of who owned the submerged lands (and the oil and other resources contained therein) off the coasts of this nation (and in the process often considered subsidiary issues like the exact parameters of a state's territorial boundaries). *See, e.g.*, *Maine II*, 469 U.S. at 505-27; *Louisiana III*, 446 U.S. at 254-73; *Maine I*, 420 U.S. at 516-28; *California II*, 381 U.S. at 142-78; *Louisiana II*, 363

U.S. at 4-85, 121-29; *Louisiana I*, 339 U.S. at 700-06; *California I*, 332 U.S. at 22-46.

In fact, the *California I* Court itself indicated that a state's possession of police powers over the 3-mile belt had no bearing on the determination of whether the state or the federal government owned the lands in dispute. "Conceding that the state has been authorized to exercise local police power functions in the part of the marginal belt within its declared boundaries, these do not detract from the Federal Government's paramount rights in and power over this area." *California I*, 332 U.S. at 36 (footnote omitted). It went on to distinguish a number of prior Supreme Court cases upholding state regulation of conduct within the states' territorial waters, including *Skiriotes v. Florida*, 313 U.S. 69 (1941). *California I*, 332 U.S. at 37-38.

A year later, the Supreme Court further considered the limitations of *California I*. In *Toomer v. Witsell*, 334 U.S. 385 (1948), the Court addressed a challenge to several South Carolina statutes governing commercial shrimp fishing in the 3-mile belt off the state's coast, *id.* at 391-407. In the process, it expressly rejected the theory that, because of *California I*, South Carolina lacked any jurisdiction beyond the low-water mark:

> Here appellants seem to concede, and correctly so, that such is neither the holding nor the implication of that case; for in deciding that the United States, where it asserted its claim, had paramount rights in the three-mile belt, the Court purportedly quoted and supplied emphasis to a statement in [*Skiriotes*, 313 U.S. at 75], that "It is also clear that Florida has an interest in the proper maintenance of the sponge fishery and that the (state) statute so far as applied to conduct within the territorial waters of Florida, in the absence of conflicting federal legislation, is within the police power of the State."

*Id.* at 393 (footnote omitted). Likewise, the Supreme Court observed in *United States v. Louisiana*, 339 U.S. 699 (1950) ("*Louisiana I*"), that "[w]e intimate no opinion on the power of a State to extend, define, or establish its external territorial limits or on the consequences of any such extension vis a vis persons other than the United States or those acting on behalf or pursuant to its authority," *id.* at 705.

**[7]** According to PMSA, the Supreme Court itself "has never been called upon to determine the effect of the SLA's boundary provisions on a state's exercise of jurisdiction over maritime conduct beyond the three-mile limit." (Appellant's Brief at 21.) We further note that PMSA does not cite to any judicial ruling actually striking down a state or local regulatory scheme on the basis of the SLA. On the contrary, the general weight of the case law clearly indicates that the federal legislation does not have the preemptive effect advanced by PMSA. We further conclude that the District Court's application of the effects test is consistent with the relevant case law. Pursuant to this test, California may enact reasonable regulations to monitor and control extraterritorial conduct substantially affecting its territory.

Initially, the Supreme Court expressly rejected a challenge to the extraterritorial application of state law to conduct occurring beyond the state's own territorial waters in its 1941 *Skiriotes* decision (which, as already noted, was subsequently considered in both *California I* as well as *Toomer).* A Florida resident was convicted in a Florida state court of using diving equipment to take sponges in violation of a state statute. *Skiriotes*, 313 U.S. at 69-72. The Supreme Court upheld the conviction, explaining, inter alia, that "[e]ven if it were assumed that the locus of the offense was outside the territorial waters of Florida, it would not follow that the State could not prohibit its own citizens from the use of the described divers' equipment at that place." *Id.* at 76. It went on to explain that, if the United States may control the conduct of its own citizens on the high seas, "we see no reason why the State of

Florida may not likewise govern the conduct of its citizens upon the high seas with respect to matters in which the State has a legitimate interest and where there is no conflict with acts of Congress." *Id.* at 77. In reaching this conclusion, the *Skiriotes* Court observed that Florida, like every other state in the Union, retains its own status and powers as a sovereign. *Id.*

Even before *Skiriotes*, the Supreme Court indicated that a state could punish actions occurring in another state of the Union because of the actions' effects. In *Strassheim v. Daily*, 221 U.S. 280 (1911), Justice Holmes observed that "[a]cts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power," *id.* at 285 (citations omitted). Accordingly, the Supreme Court found that an individual could be prosecuted under the laws of Michigan for criminal acts committed in Illinois that had an impact on Michigan. *Id.* at 284-85 ("If a jury should believe the evidence, and find that Daily did the acts that led Armstrong to betray his trust, deceived the board of control, and induced by fraud the payment by the state, the usage of the civilized world would warrant Michigan in punishing him, although he never had set foot in the state until after the fraud was complete.").

Likewise, the Supreme Court in *Huron Portland Cement Co.* refused to bar the prosecution of a ship owner for violating a municipal smoke abatement provision when its vessels were docked at the city's port even though "[s]tructural alterations would be required in order to insure compliance." 362 U.S. at 441.

**[8]** Given this precedent, it is not surprising that (as the District Court recognized) the Restatement provides that a state may regulate conduct occurring outside of its territorial boundaries if the conduct has (or is intended to have) a sub-

stantial effect within the territory and the regulation itself is otherwise reasonable. *See* Restatement (Third) of Foreign Relations Law of the United States §§ 402(1)(c), 403.

Likewise, we previously relied on the contacts between conduct occurring beyond California's narrow 3-mile belt and the state itself in order to reject a challenge to the application of state law to such extraterritorial conduct. In *PMSA v. Aubry*, 918 F.2d 1409 (9th Cir. 1990), several entities, including PMSA itself, brought suit against California's Labor Commissioner seeking to prevent the enforcement of the state's overtime pay laws with respect to employees providing off-shore transportation, clean-up, and other services to oil platforms located between 1 to 12 nautical miles off the California coast, *id.* at 1411-15. We expressly recognized the distinction between the "territorial sea," defined as "the sea from shore to three nautical miles off shore," and the "high seas," considered to be the "ocean waters outside the territorial sea, i.e., more than three miles offshore." *Id.* at 1412. The *Aubry* Court then considered "one core issue: Does federal law preempt California from applying its overtime pay laws to seamen working on territorial waters and on the high seas off the California coast and to maritime employees working primarily on the high seas off the California coast, when the vessels on which the employees work do not engage in foreign, intercoastal, or coastwise voyages."[2] *Id.* at 1415. In the process, we addressed the federal Shipping Act, the Fair Labor Standards Act ("FLSA"), and the doctrine of general admiralty or maritime law preemption. *Id.* at 1415-27. Answering the question stated above in the negative, we emphasized the various California contacts present. For instance, we noted that "Aubry has attempted to provide additional protection to

[2]As defined by the Shipping Act, "intercoastal voyages" are voyages between ports on the Atlantic and Pacific coasts, while "coastwise voyages" are voyages between a port in one state and a port in a non-adjoining state. *Aubry*, 918 F.3d at 1412 (citing 46 U.S.C. §§ 10301(a)(2), 10501(a)).

employees involved in work of critical importance to the state —containment and clean-up of marine oil spills" and that "the record indicates that the maritime employees involved in this case are California residents, were interviewed and hired in California, and pay California taxes." *Id.* at 1424-25. In *Fuller v. Golden Age Fisheries*, 14 F.3d 1405 (9th Cir. 1994), we subsequently relied on this same line of reasoning in order to distinguish *Aubry* and conclude that federal law preempted Alaska state wage and overtime claims filed by crew members working on a factory trawler, *id.* at 1409 (noting, inter alia, that trawler engages in coastwise voyages, plaintiffs' dominant job situs were the high seas, plaintiffs were not Alaska residents, were generally hired in and began their employment in Seattle, and were typically flown back to Seattle when their employment concluded, and Alaska's Department of Labor indicated that it generally does not exercise jurisdiction in such circumstances).

Despite the existence of the SLA, other courts from across the country also have consistently rejected challenges to the application of state law to conduct on the high seas based, at least in part, on a consideration of the effects of such conduct on the state in question.

The Florida Supreme Court affirmed the conviction of an American citizen (but non-Florida resident) on state charges of burglary and attempted sexual battery committed on the high seas (approximately 100 nautical miles from Florida's Atlantic coast) on board a foreign-registered and foreign-owned cruise ship against a 13-year old American citizen (who also did not reside in Florida). *State v. Stepansky*, 761 So.2d 1027, 1029-37 (Fla. 2000). The prosecution occurred pursuant to a Florida "special maritime criminal jurisdiction" statute providing, inter alia, for jurisdiction over a crime occurring on a cruise ship where the majority of paying passengers embarked and intended to disembark in Florida, where the criminal act is also prohibited by federal law, and where neither the federal government, the flag state, nor the

state possessing jurisdiction over the territory in which the crime occurred have acted. *Id.* at 1030, 1035. The *Stepansky* court found that this statutory provision and the resulting prosecution were consistent with fundamental principles of federalism, Congress's constitutional powers to define piracies and felonies committed on the high seas, the constitutional prohibition against states entering treaties, and the doctrine of general maritime law preemption. *Id.* at 1030-35. It then applied the effects test to find that the state's exercise of jurisdiction here fell under its sovereign police powers. *Id.* at 1035-37. According to the Florida Supreme Court, this test was satisfied because Florida's crucial tourism industry could be significantly affected if crimes on board cruise ships where a majority of the passengers embark and disembark in Florida go un-prosecuted. *Id.* at 1036.

In *State v. Jack*, 125 P.3d 311 (Alaska 2005), the Alaska Supreme Court agreed with *Stepansky* and found that Alaska possessed extraterritorial criminal jurisdiction over an alleged sexual assault committed on board an Alaskan state ferry in Canadian waters, *id.* at 312-22. Among other things, the court observed that the ferry route to Washington constitutes an important link with the rest of the country, the ferry serves localities lacking road access, ferries are important to the state's tourism industry, and the lack of a prosecution could be harmful to Alaska, its economy, and its residents. *Id.* at 322.

Likewise, we observe that the California Supreme Court in *Weeren* affirmed the criminal convictions of California residents, who held California commercial fishing licenses and used vehicles based and licensed in California, for violation of California's commercial swordfish regulations by utilizing spotter aircraft to catch fish outside of the state's territorial waters. 26 Cal. 3d at 658-70. In addition to recognizing the state's power to regulate the extraterritorial conduct of its own residents, the state supreme court observed that California had a powerful interest in preserving its fisheries and that such an

interest extended beyond its borders because fish swim and do not otherwise respect the borders drawn by governmental entities. *Id.* at 666-67.

Based on the same line of reasoning, the Alaska Supreme Court, in a very thorough opinion addressing, among other things, the SLA and the *California I* line of cases, upheld the state's expansive crabbing regulations as applied to American fishermen operating outside of the state's own territorial waters. *State v. Bundrant*, 546 P.2d 530, 533-56 (Alaska 1976). The same court then applied this same basic approach to an Alaskan resident's violation of the state's scalloping regulations outside of the state's territorial waters. *State v. Sieminski*, 556 P.2d 929, 930-34 (Alaska 1976). In fact, even though it ultimately granted a preliminary injunction against the enforcement of Alaska's crabbing scheme on Due Process and dormant Commerce Clause grounds, the federal district court actually determined that it was not reasonably certain that plaintiffs would ultimately succeed on a statutory pre-emption claim premised in part on § 1312. *Hjelle v. Brooks*, 377 F. Supp. 430, 432-42 (D. Alaska 1974).

Furthermore, we conclude that the District Court quite properly relied on two circuit court decisions expressly considering the SLA and its bearing on a state's power to regulate extraterritorial conduct. Both of these decisions provide yet further support for the District Court's preemption ruling.

In *Warner v. Dunlap*, 532 F.2d 767 (1st Cir. 1976), the First Circuit specifically addressed the question of whether a Rhode Island statute, requiring every foreign vessel and every American vessel registered for foreign trade traversing Block Island Sound to take on a Rhode Island-licensed pilot, falls under the scope of the federal pilotage statute, *id.* at 768. This federal provision, already mentioned in connection with our brief discussion of *Maine II*, provides for the state regulation of pilots in bays, inlets, rivers, harbors, and ports. Considering a challenge filed by Connecticut pilots, the federal appellate

court ultimately upheld the state requirement, finding that the waters in question constituted a "bay." *Id.* at 768-72. In the process, it specifically rejected the Connecticut pilots' theory that Rhode Island could not regulate their activities on the grounds that the routes they used were more than 3 miles off of the Rhode Island shore and that, pursuant to the SLA, the state only has territorial jurisdiction over this 3-mile zone. *Id.* at 772. According to the First Circuit:

> We do not, however, find merit in this claim. The issue of a state's territorial limits, see, e.g., [*California II* and *Maine I*], supra, is distinct from that of its right to control navigation. States have been permitted to assert their pilotage regulations at distances greater than three miles from their shores. By permitting states to regulate local pilotage Congress sought to protect vessels from "invisible hazards" that may be present in a state's waters until the ship can be guided to the open sea. And there is no statutory or other basis for imposing a three-mile limit on such regulation.

*Id.* (footnote omitted) (citations omitted). In an accompanying footnote, the First Circuit specifically upheld the district court's finding that Block Island Sound was not part of the open ocean.[3] *Id.* at 772 n.14.

The Fifth Circuit considered a similar challenge in *Gillis v. Louisiana*, 294 F.3d 755 (5th Cir. 2002). Pilots claimed that Louisiana lacked the authority to regulate their activities on the portion of the Calcasieu Ship Channel lying more than 3 miles from the state's coastline. *Id.* at 756. The Fifth Circuit rejected this claim, noting, inter alia, that Congress has tradi-

---

[3]In *Maine II*, the Supreme Court likewise concluded that at least a portion of Block Island Sound constituted a juridical bay and therefore internal state waters. *Maine II*, 469 U.S. at 505-27. In its opinion, the Supreme Court expressly referred to the First Circuit's ruling in *Warner*. *Id.* at 507.

tionally left the regulation of pilotage largely to the states. *Id.* at 756-62. With respect to the pilots' argument that Congress's enactment of § 1312 limited the ability of the states to regulate pilotage beyond their respective seaward boundaries, the *Gillis* court stated that:

> First, we disagree with the Pilots' premise that Congress implicitly limited state authority to regulate pilotage to bodies of water within their territorial boundaries when it enacted 43 U.S.C. § 1312. Section 1312, which is part of the Submerged Lands Act, addresses only who retains title to submerged lands both within and beyond the three-mile line, with particular reference to ownership and exploration of natural resources in the seabed and subsoil. It does not address the regulation of pilotage on the waters above.

*Id.* at 761 (footnote omitted). In reaching this conclusion, the Fifth Circuit expressly relied on the earlier ruling in *Warner*. *Id.* at 761 n.10.

In the end, PMSA does raise an extensive range of arguments regarding this case law and its overall theory of SLA preemption. We specifically acknowledge that the prior decisions could certainly be distinguished in a variety of ways, and we further recognize that at least some of these cases may have problems or deficiencies of their own. However, we cannot overlook the clear weight of this case law, especially in light of the applicable general presumption against preemption.

Accordingly, we believe that PMSA simply reads too much into the SLA itself. Congress, responding to such cases as *California I*, was primarily concerned with the distinct question of who owned the "submerged lands" and their valuable natural resources and accordingly adopted legislation that, to a great extent, was essentially a kind of real estate convey-

ance. Even if the statute does set out state territorial boundaries, it does not really address the separate question of whether the states are totally precluded from regulating any conduct beyond their seaward boundaries, even if such conduct clearly harms the state, its residents, and its interests. While the location of a state's territorial boundaries remains a critical consideration, it does not appear that Congress ever intended to create some sort of absolute (or near-absolute) rule under which otherwise sovereign states are precluded from exercising their expansive police powers with respect to extraterritorial conduct even if such an exercise is more than amply justified and does not interfere or conflict with any specific federal statute. In other words, PMSA is wrong to suggest that the SLA creates a territorial zone in which federal authority is not only paramount but always (or almost always) exclusive. In fact, the relatively terse provisions contained in the SLA appear to be at odds with such a broad suggestion, especially when compared with the extensive and elaborate preemptive schemes addressed in such cases as *Locke*.[4]

**[9]** Accordingly, the District Court was correct to conclude that, given the limited purposes of the SLA, it should not be applied in a mechanical fashion to override any and all state regulation of conduct occurring more than 3 miles from the coast.[5] On the contrary, a state law regulating extraterritorial

---

[4]We further observe that, like *Locke*, our prior ruling in *Chevron U.S.A. Inc. v. Hammond*, 726 F.2d 483 (9th Cir. 1984), dealt with the claim that Alaska's ballast requirements for oil tankers were preempted under the PWSA and the Ports and Tanker Safety Act of 1978 ("PTSA"), *id.* at 485-501. Therefore, our dicta regarding the paramount federal interest in uniform environmental regulation of deep ocean waters must be considered in its specific context. *See id.* at 492 n.12. In any case, we return to this dicta in Section III.B., *infra*.

[5]We further observe that PMSA undercuts its own preemption theory by appearing to recognize a rather lengthy list of qualifications or exceptions to its purported general rule of federal exclusivity beyond the SLA boundaries (e.g., pilotage regulations, the application of a generally applicable state law to a particular prior crime or specific incident, or the regulation

conduct outside of the state's territorial waters should gener- ally be upheld if it satisfies the well-established effects test (and, of course, is not otherwise foreclosed by any other fed- eral constitutional, statutory, or regulatory requirement).

**[10]** Applying this effects test to the Vessel Fuel Rules,[6] we agree with the District Court that there are, at the very least, genuine issues of material fact precluding summary judgment in favor of PMSA. In fact, PMSA does not dispute either the devastating impact on California and its residents of the low-grade fuel used by ocean-going vessels within 24 miles of the state's coastline or the clear benefits of the Vessel Fuel Rules themselves. Having supported the ratification of Annex VI and the recent adoption of the ECA, PMSA evi- dently has no real objection to the underlying fuel use require- ments established by CARB and merely seeks a single universal standard applicable in all jurisdictions. Likewise, we

of conduct by the state's own residents). On the other hand, it also appears to call into question the significance of the boundaries purportedly estab- lished by the SLA by failing to concede that the Vessel Fuel Rules are valid within the 3-mile belt and apparently leaving open the real possibil- ity of a future legal challenge even if it prevails in the current litigation.

[6]PMSA contends that the Vessel Fuel Rules do not constitute an "effects-based" regulation. According to PMSA, the current regulations merely target the fuel used, unlike CARB's Marine Vessel Rules that actu- ally targeted the emissions resulting from the fuel used (in other words, the "effects" of the fuel). Of course, we previously struck down these emission standards as preempted by the Clean Air Act. Goldstene, 517 F.3d at 1109-15. We further indicated that in-use fuel requirements would not be barred by the Clean Air Act. *Id.* at 1115. CARB quite understand- ably drafted the Vessel Fuel Rules in order to correct the fatal deficiency identified in *Goldstene*, only for PMSA to now claim that the resulting regulations cannot satisfy the well-established effects test. In any case, we conclude that the Vessel Fuel Rules are clearly premised on the harmful effects of the fuel used by the ocean-going vessels governed by the regula- tions. In the apt words of the District Court, "[t]he express purpose of the regulations . . . is to reduce air pollutants affecting the State of California by requiring ocean-going vessels to use cleaner marine fuels." (ER24 (footnote omitted).)

further observe that the Vessel Fuel Rules generally apply to "foreign and U.S. flag-commercial ships calling at California ports," and, among other things, contain an exemption for vessels merely passing through the region. (Appellant's Brief at 5.) Especially in light of the sheer amount and importance of the shipping that goes through California (particularly Southern California), the regulated conduct here clearly has a close connection with the state, even apart from the environmental impact of this conduct. Contrary to PMSA's characterizations, we are also confronted with a state regulatory scheme applicable to the high sea waters immediately adjacent to the state itself (as opposed, for example, to an attempt to regulate ships in Shanghai Harbor because of their effects on global climate change).

Turning to the specific environmental effects, we observe that: (1) in 2006, ocean-going vessels operating within the applicable 24-mile zone were estimated to generate, per day, approximately 15 tons of PM, 157 tons of $NO_x$, and 117 tons of $SO_x$; (2) emissions from these vessels are believed to constitute the single largest source of $SO_x$ emissions in California; (2) the vessels' daily PM emissions represent the equivalent of approximately 150,000 big rig trucks traveling 125 miles per day; (3) 27 million Californians, representing 80% of the state's population, are exposed to these emissions; (4) these emissions are known to cause cancer, respiratory illnesses, and to increase the risk of heart disease, and CARB estimated that the vessels' direct PM emissions alone cause at least 300 premature deaths every single year; and (5) the effects of the fuel use have long been especially severe in the South Coast Air Basin region of Southern California, with over 80% of the population in this heavily populated region exposed to PM2.5 levels exceeding federal standards. In fact, the harmful effects giving rise to the Vessel Fuel Rules appear to be even more severe than, for example, the somewhat more indirect effect of criminal acts committed on a foreign cruise ship on the high seas and on a state's tourism industry.

Full implementation of the Vessel Fuel Rules should significantly reduce these harmful effects (e.g., sulfur oxide emissions should be cut by approximately 90%). This should then result, inter alia, in health care savings as well as the prevention of approximately 3,500 premature deaths and nearly 100,000 asthma attacks. In addition, the South Coast District should finally be able to comply with national air quality standards by the 2014 deadline and thereby avoid the threat of federal sanctions.

We add that the apparent effects of the Vessel Fuel Rules on foreign and interstate commerce and navigation provide additional support for our ruling here. In *English v. General Electric Co.*, 496 U.S. 72 (1990), the Supreme Court found that federal law did not preempt a state law claim for intentional infliction of emotional distress brought by an employee at a nuclear-fuels production facility against her employer arising out of alleged retaliatory actions because of her safety complaints, *id.* at 74-90. The Court specifically observed that the effect of the litigation (specifically that, as employers find retaliation more costly, they will be forced to deal with worker complaints by other means, including altering their safety policies) was "neither direct nor substantial enough to place petitioner's claim in the pre-empted field [of nuclear safety]." *Id.* at 85. The District Court likewise emphasized that PMSA presented no evidence indicating that the Vessel Fuel Rules impeded commerce or navigation, observing in particular that: (1) PMSA admitted that compliance is not technically impossible or even especially difficult; (2) PMSA failed to show that the required fuel is unavailable or otherwise would adversely affect ship operations; and (3) any increased cost, although estimated at approximately $30,000.00 per vessel call, would appear to be relatively small in comparison with the overall cost of a trans-Pacific voyage (representing less than 1% of the cost of a typical trans-Pacific voyage and approximately a $6.00 increase per 20-foot shipping container) as well as the increased costs eventu-

ally passed on to the ultimate consumer (amounting, for instance, to an extra *12.5 cents* in the cost of a plasma TV).

Admittedly, we observe that the overall costs to the shipping industry of complying with a rather expansive regulatory program applicable to one of the largest and most important trade routes in the world do appear to be quite significant (with the industry-wide cost of compliance estimated at $360 million annually and *$1.5 billion* through the end of 2014). However, we do believe that PMSA still fails to show the absence of any genuine issue of material fact with respect to the regulations' impact on commerce and navigation. *See., e.g.*, *Ray v. Alt. Richfield Co.*, 435 U.S. 151, 179-80 (1978) (rejecting dormant Commerce Clause challenge to state tug-escort requirement for oil tankers in part because it did not "appear from the record that the requirement impedes the free and efficient flow of interstate and foreign commerce, for the cost of the tug escort for a 120,000 DWT tanker is less than one percent per barrel of oil and the amount of oil processed at Puget Sound refineries has not declined as a result of the provision's enforcement").

**[11]** For the foregoing reasons, we determine that, in light of the applicable presumption against preemption, the District Court properly denied PMSA's motion for summary judgment as to its claim of implicit field preemption under the SLA.

## B.   The Dormant Commerce Clause And General Maritime Law Preemption

**[12]** The Commerce Clause of the United States Constitution gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. Art. I, § 8, cl. 3. The vital role of the Commerce Clause to our federal system of government is undisputed. It was designed in the first place "to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies

and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979) (citation omitted). Under the dormant Commerce Clause doctrine, state legislation may be unconstitutional because of its effect on national or foreign commerce even in the absence of Congressional action. *See, e.g.*, *Barclay's Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 310 (1994). The Commerce Clause power, nevertheless, still "belongs to Congress, not the courts," and the whole objective of the dormant Commerce Clause doctrine is to protect Congress's latent authority from state encroachment. *Fednav, Ltd.*, 547 F.3d at 624.

In *Barber*, we observed that the Supreme Court has generally outlined a two-tiered approach to the dormant Commerce Clause:

> "[T]he first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it 'regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce.' As we use the term here, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. If a restriction on commerce is discriminatory, it is virtually per se invalid. By contrast, nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'

42 F.3d at 1194 (quoting *Or. Waste Sys. Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994)). In other words, there are two broad categories of state regulations burdening interstate commerce: (1) those that directly burden interstate commerce or otherwise discriminate against out-of-state interests; and (2) those that incidentally burden commerce. *See, e.g.*, *Kleen-*

*well Biohazard Waste & Gen. Ecology Consultants, Inc. v. Nelson*, 48 F.3d 391, 395 (9th Cir. 1995). Regulations falling under the first category are generally struck down, while those in the second group are reviewed under a balancing test. *See, e.g.*, *id.* Under this balancing test, regulations may violate the Commerce Clause if the burdens they impose so outweigh the putative benefits so as to render the regulations unreasonable or irrational. *See, e.g.*, *UFO Chuting of Haw., Inc. v. Smith*, 508 F.3d 1189, 1196 (9th Cir. 2007). In turn, this Court previously explained that "[i]t is clear, however, that the Supreme Court used the term 'direct' to refer to regulations whose *central* purpose is to regulate commerce, usually in order to benefit local interests." *Nelson*, 48 F.3d at 396.

The Commerce Clause imposes certain specific restrictions with respect to the extraterritorial reach of state law. These limitations "reflect the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989) (footnotes omitted). Accordingly, the Commerce Clause prohibits state legislation regulating commerce that takes place wholly outside of the state's borders, regardless of whether the commerce has effects within the state. *See, e.g.*, *id.* at 336; *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982). Among other things, the court must consider the practical effects of the regulatory scheme, taking into account the possibility that other states may adopt similar extraterritorial schemes and thereby impose inconsistent obligations. *See, e.g.*, *Healy*, 491 U.S. at 336-37. Nevertheless, in applying these standards, a court must not overlook the fact that the "critical consideration in determining whether the extraterritorial reach of a statute violates the Commerce Clause is the overall effect of the statute on both local and interstate commerce." *Id.* at 337 n.14 (citing *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)).

The foreign commerce context places further constraints on state power because of " 'the special need for federal uniformity.' " *Barclays Bank PLC*, 512 U.S. at 311 (quoting *Wardair Canada Inc. v. Fla. Dep't of Revenue,* 477 U.S. 1, 8 (1986)). Accordingly, a court must also take into account the federal government's "capacity to 'speak with one voice when regulating commercial relations with foreign governments.' " *Id.* (quoting *Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 448 (1979)).

This appeal further implicates the doctrine of general admiralty or maritime law preemption, which resembles the dormant Commerce Clause doctrine. The Constitution provides that the judicial power of the United States shall extend "to all Cases of admiralty and maritime Jurisdiction." U.S. Const. Art. III, § 2, cl. 1. In *Southern Pacific Co. v. Jensen*, 244 U.S. 205 (1917), the Supreme Court held that no state regulation is valid "if it contravenes the essential purpose expressed by an act of Congress, or works material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations," *id.* at 216. In *Aubry*, we observed that "[o]ur review of relevant case authority leads us to conclude that the general rule on preemption in admiralty is that states may supplement federal admiralty law as applied to matters of local concern, so long as state law does not *actually conflict* with federal law or *interfere* with the *uniform working* of the maritime legal system." *Aubry*, 918 F.3d at 1422 (footnote omitted). To determine whether there is any interference, we must yet again apply a balancing test, weighing the state and federal interests on a case-by-case basis. *See, e.g.*, *In re Exxon Valdez*, 484 F.3d 1098, 1101 (9th Cir. 2007).

Although generally framed in dormant Commerce Clause terms, PMSA advances a number of arguments in support of its challenge to the Vessel Fuel Rules. In addition to prior case law, it relies, inter alia, on Annex VI of MARPOL and the ECA program, the Clean Air Act, and two Presidential

Proclamations purportedly extending the "territorial sea" or "contiguous zone" of the United States.[7] At their most fundamental level, these contentions appear to rest on the fundamental role of uniformity and the need for this country to speak with only one voice in its dealings with other countries without undue embarrassment arising from disparate state regulatory schemes. After considering PMSA's various arguments, we must ultimately reject the Commerce Clause and general maritime law preemption claims at this time. Simply put, the fact that the Vessel Fuel Rules require ocean-going vessels to switch to cleaner fuels 24 miles from California's coast, and not 3 miles from the coast, does not conflict with either the dormant Commerce Clause or the fundamental principles of general maritime law.

[13] Initially, the regulatory scheme at issue here clearly does not fall under the "direct" category of state regulations because the central purpose of the Vessel Fuel Rules is to protect the health and well-being of the state's residents from the harmful effects of the fuel used by ocean-going vessels. The otherwise even-handed and generally applicable Vessel Fuel Rules also do not appear to discriminate against any out-of-state interests. We therefore are not presented with an example of state economic protectionism or favoritism. We are instead faced with an environmental regulatory scheme having only an incidental or indirect effect on commerce. We further note that the Supreme Court in *Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978), actually found that a state tug requirement was not barred by the Commerce Clause because, inter alia, the cost of a tug escort for a 120,000-ton tanker "is less than one cent per barrel of oil" and there was no evidence

---

[7]Specifically, Presidential Proclamation No. 5928, issued by President Reagan in 1988, extends the "territorial sea of the United States" to 12 nautical miles from the United States's baselines. Likewise, President Clinton issued Presidential Proclamation No. 7219 in 1999, which extends the "contiguous zone of the United States" to 24 nautical miles from the respective baselines. Both Proclamations state, inter alia, that they do not amend or otherwise alter existing federal or state law.

that the requirement would impede the free and efficient flow of commerce, *id.* at 179. As discussed in Section III.A.2., *supra*, the regulations at issue here also appear to impose a relatively light burden on navigation and commerce.

**[14]** The Vessel Fuel Rules also do not apply to commercial activities occurring "wholly outside" of the territorial limits of California. They instead continue to govern the fuel use of ocean-going vessels traveling to and from California's ports while they are within the state's own territorial waters. We further note that PMSA evidently does not claim that the Vessel Fuel Rules contravene any act of Congress (with the major exception of the SLA) or prejudice any "characteristic feature" of federal maritime law.

The Court therefore must turn to a balancing test with respect to both the dormant Commerce Clause and general maritime law preemption claims.

We recognize the importance of uniformity as well as the unique role of the federal government in matters of foreign relations and international trade. In fact, the federal government, foreign countries, and international bodies have continued to take steps to control the critical problem of air pollution originating from ocean-going vessels, most significantly in the recently adopted ECA.

We further observe that we have emphasized that the notion of uniformity takes on special importance with respect to environmental regulation on the high seas. In *Hammond*, we rejected the claim that Alaska's prohibition against oil tankers discharging ballast from their oil tanks into the state's territorial waters was preempted by the PWSA and PTSA. *Hammond*, 726 F.2d at 484-501. In a footnote, we expressly distinguished between coastal environmental regulation and regulation in deep waters: "Of course, as to environmental regulation of deep ocean waters, the federal interest in uniformity is paramount. Such regulation in most cases needs to be

exclusive because the only hope of achieving protection of the environment beyond our nation's jurisdiction is through international cooperation." *Id.* at 492 n.12. The *Aubry* Court likewise referenced this footnote in its discussion of whether California's overtime laws were preempted by federal admiralty or maritime law. *Aubry*, 918 F.2d at 1426 n.24. In a footnote, we explained that "our concern [in *Hammond*] was clearly with regulation of *international* oil transport and *international* environmental protection efforts" and that "the federal interest in uniformity is not as great, because the employees involved in [*Aubry*] are not engaged in foreign, intercoastal, or coastwise voyages." *Id.*

**[15]** Nevertheless, we conclude that the interests weighing in favor of striking down the Vessel Fuel Rules are rather attenuated in the present circumstances. Among other things, the District Court appropriately noted that the federal statute implementing Annex VI of MARPOL contains an express savings clause. *See* 33 U.S.C. § 1911 ("Authorities, requirements, and remedies of this chapter supplement and neither amend nor repeal any other authorities, requirements, or remedies conferred by any other provision of law. Nothing in this chapter shall limit, deny, amend, modify, or repeal any other authority, requirement, or remedy available to the United States, or any person, except as expressly provided in this chapter."). The Vessel Fuel Rules also contain a sunset clause, and it is reasonable to predict that, once the heightened standards established by the ECA go into effect, the Vessel Fuel Rules will be terminated. In the end, no federal (or international) environmental regime specifically prohibits the state regulations at issue here. *See, e.g.*, *Goldstene*, 517 F.3d at 1115 (noting that Clean Air Act permits state in-use requirements). With respect to the *Hammond* (and *Aubry*) dicta, the District Court reasonably noted that the language regarding the federal interest in uniformity "does not apply here . . . inasmuch as the United States has established a 24-mile contiguous zone for purposes of exercising territorial control" and "[t]he area at issue in this case falls within that twenty-four

mile zone and does not extend to international deep waters falling outside that boundary." (ER35 n.4 (citing Presidential Proclamation No. 7219).)

Accordingly, we are not currently confronted with a state attempting to regulate conduct in either another state of the Union (such as in PMSA's example of a hypothetical California regulatory scheme requiring automobiles driving from Arizona to switch to certain kinds of fuel 24 miles from the California border), in the territory or waters of a foreign nation (such as, in another example provided by PMSA, a regulation governing fuel use in Shanghai harbor), or in the open ocean waters hundreds or even thousands of miles from the state's coast.

[16] In contrast, the state of California clearly has an especially powerful interest in controlling the harmful effects of air pollution resulting from the fuel used by ocean-going vessels while they are within 24 miles of the state's coast. In Section III.A.2., *supra*, we discussed in some detail the undisputed evidence regarding the highly damaging and even life-threatening effects of this air pollution on the people of California as well as the clear benefits resulting from the regulations adopted by CARB. The protection of our environment has repeatedly been recognized as a legitimate and important state interest. *See, e.g., Huron Portland Cement Co.*, 362 U.S. at 442, 445-46, 448; *Nelson*, 48 F.3d at 398, 400-01; *Aubry*, 918 F.2d at 1426. Based on the record before us, the exceptionally powerful state interest at issue here far outweighs any countervailing federal interests.[8]

---

[8]Furthermore, we also should not overlook the fact that the Vessel Fuel Rules are apparently necessary in order for the South Coast District to comply with federal air quality standards by the applicable 2014 deadline (and thereby avoid the possible imposition of various sanctions by the EPA, including the loss of billions of dollars in federal transportation funds). At the very least, it appears to be especially inappropriate to strike down state regulations as contrary to the dormant Commerce Clause or the doctrine of general maritime law preemption when these same regulations are needed to comply with basic federal standards in the first place.

Therefore, we must reject PMSA's dormant Commerce Clause and general maritime law theories at this juncture. Our result is consistent with the overwhelming weight of the case law.

We note that the Supreme Court in *Huron Portland Cement Co.* rejected a Commerce Clause challenge to the prosecution of a ship owner for violating a municipal smoke abatement provision when its vessels were docked at the city's port even though "[s]tructural alterations would be required in order to insure compliance." 362 U.S. at 441. Emphasizing that the local ordinance represented a generally applicable rule designed to promote the health and welfare of the community, the Court went on to reject the challenger's argument "that other local governments might impose differing requirements as to air pollution" as unsupported by the record. *Id.* at 448. Likewise, it appears that no other state in the Union has adopted, or is likely to adopt before the full implementation of the ECA, any "competing or conflicting" fuel use requirements. *Id.*

In *Aubry*, we likewise rejected the claim that the doctrine of general maritime or admiralty law preemption precluded the application of California's overtime pay laws to California residents working on the high seas off the California coast to protect the state's coastal environment. *Aubry*, 918 F.2d at 1419-27. The Florida Supreme Court in *Stepansky* also expressly determined that a state court conviction for crimes committed on a cruise ship on the high seas pursuant to Florida's special maritime criminal jurisdiction statute did not violate the general maritime law preemption doctrine. 761 So. 2d at 1033-34. Similarly, the Alaska Supreme Court rejected a dormant Commerce Clause challenge to Alaska's expansive and extraterritorial restrictions on crabbing. *Bundrant*, 546 F.2d at 537-41. While we again acknowledge that these various decisions may be distinguishable on a variety of grounds, we believe that they provide further support for upholding the California regulations.

**[17]** In the end, we acknowledge the unusual characteristics and circumstances of the Vessel Fuel Rules. We are clearly dealing with an expansive and even possibly unprecedented state regulatory scheme. However, the severe environmental problems confronting California (especially Southern California) are themselves unusual and even unprecedented. Under the circumstances, we do not believe that the Commerce Clause or general maritime law should be used to bar a state from exercising its own police powers in order to combat these severe problems.

IV.

For the foregoing reasons, we will affirm the District Court's denial of PMSA's motion for summary judgment.

**AFFIRMED.**